UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(FORT LAUDERDALE DIVISION)
www.flsb.uscourts.gov

CASE NO. 09-34791-BKC-RBR
CHAPTER 11

In re

ROTHSTEIN ROSENFELDT ADLER, P.A.,

      Debtor.

_____/

HERBERT STETTIN, not individually but                   ADV. NO.
as Chapter 11 Trustee of the estate of the
Debtor, Rothstein Rosenfeldt Adler, P.A.,

      Plaintiff,

v.

REGENT CAPITAL PARTNERS, LLC,
a New York limited liability company,
LAURA HUBERFELD and MURRAY HUBERFELD,
husband and wife, NAOMI BODNER and
DAVID BODNER, husband and wife,
the BODNER FAMILY FOUNDATIONS,
a New York Corporation, DAHLIA KALTER and
MARK NORDLICHT, husband and wife, and
SFS CAPITAL FUNDING, LLC, a Nevada
limited liability company,

      Defendants.

_____/

## ADVERSARY COMPLAINT TO AVOID AND TO RECOVER FRAUDULENT TRANSFERS, FOR TURNOVER, FOR AN ACCOUNTING, UNJUST ENRICHMENT AND FOR OTHER RELIEF

      Herbert Stettin (the "Trustee" or "Stettin"), not individually but as Chapter 11 Trustee of

the bankruptcy estate of the Debtor, Rothstein, Rosenfeldt Adler, P.A. (the "Debtor" or "RRA"),

files this Adversary Complaint against Regent Capital Partners, LLC, a New York limited

liability company ("Regent"), Laura Huberfeld, Murray Huberfeld, Naomi Bodner, David Bodner, the Bodner Family Foundation, Dahlia Kalter, Mark Nordlicht and SFS Capital Funding, LLC (collectively, the "Defendants"), to avoid and to recover fraudulent transfers from the Debtor to the Defendants, for turnover of property, for an accounting, for unjust enrichment, and for other relief pursuant to Sections 542, 544, 548, and 550 of Title 11 of the United States Code (the "Bankruptcy Code"), Chapter 726 of the Florida Statutes, Rule 7001, et seq. of the Federal Rules of Bankruptcy Procedure and federal common law, and says:

<u>The Parties, Jurisdiction and Venue</u>

1.      On November 2, 2009, Stettin was appointed receiver of RRA in an action commenced in the Broward County Circuit Court styled *Stuart Rosenfeldt and Rothstein Rosenfeldt Adler, P.A. v. Scott W. Rothstein*, Case No. 09-059301(07).

2.      On November 10, 2009 (the "Petition Date"), a group of petitioning creditors filed an involuntary petition for reorganization under Chapter 11 of the Bankruptcy Code against the Debtor.

3.      By order dated November 20, 2009, Stettin was appointed and continues to serve as the Chapter 11 Trustee for the Debtor's bankruptcy estate.

4.      By order dated November 25, 2009, RRA consented to the entry of an Order for Relief under Chapter 11 of the Bankruptcy Code.

5.      Defendant Regent is a New York limited liability company having a principal address of 5521 11th Avenue, Brooklyn, New York 11219.   Regent was incorporated on November 28, 2008, to acquire an interest in a purported confidential settlement denominated as "RRA-G350" (the "Regent Side-Deal").

6.      Defendant Laura Huberfeld is a member of Regent and a resident of the State of

New York.  She is the wife of Defendant Murray Huberfeld, who at all relevant times was Chairman and Chief Investment Officer of Centurion Structured Growth, LLC ("Centurion") and otherwise involved in the management of Platinum Partners Value Arbitrage Fund, LP ("Platinum") and Level 3 Capital Fund, LP ("Level 3")(Centurion, Platinum and Level 3 shall at times be collectively referred to collectively as the "Funds")[1].  Murray Huberfeld is a resident of the State of New York.  Defendants Laura Huberfeld and Murray Huberfeld shall at times be collectively referred to as, the "Huberfelds".

7.       Defendant Dahlia Kalter A/K/A Dahlia Kalter-Nordlicht is a member of Regent and a resident of the State of New York.  She is the wife of Defendant Mark Nordlicht A/K/A Meyer Nordlicht A/K/A Meir Nordlicht, a partner and Chief Investment Officer of Platinum and Centurion, and also a resident of the State of New York.  Defendants Dalia Kalter and Mark Nordlicht shall at times collectively be collectively referred to as, the "Nordlichts".

8.       Defendant Naomi Bodner is a member of Regent and a resident of the State of New York.  She is the wife of Defendant David Bodner, also a resident of the State of New York.  Although David Bodner does not appear to hold an official position with the Funds, he maintains a desk at the offices of Centurion and/or Platinum and is believed to control significant investments in the Funds through family interests.  Defendants Naomi Bodner and David Bodner shall at times collectively be collectively referred to as, the "Bodners."

9.       Defendant Bodner Family Foundation, Inc. (the "Bodner Foundation") is upon information and belief a New York not-for-profit entity operated for the benefit of and controlled by the Bodners.

---

[1] The Funds are the subject of a separate adversary proceeding seeking the recovery of over $420 million in avoidable transfers from the Debtor styled *Stettin v. Centurion Structured Growth, LLC et al.*, Adv No. 10-3802-BKC-RBR-A.

10.     Defendant SFS Capital Funding, LLC ("SFS Funding") is a Nevada limited liability company formed and controlled by Frank Preve ("Preve").   Upon information and belief, Jack Simony ("Simony") held an interest in SFS Funding, or alternatively, received transfers from the Debtor through SFS Funding.  Simony, at all relevant times, was a portfolio manager for Centurion and/or Platinum. [2]

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 157(a) and 1334(b).

12.     This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (C), (E), (H) and (O).  The Trustee consents to the entry of final orders and judgment by the Bankruptcy Court.

13.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

FACTS SUPPORTING THE CLAIMS

A.      **The Rothstein Ponzi Scheme**

14.     The Debtor, a Florida professional association incorporated on February 7, 2002, maintained a principal office at 401 East Las Olas Boulevard, Suite 1650, Fort Lauderdale, Florida, as well as satellite offices in South Florida and New York City.

15.     Prior to the Petition Date, RRA's Chief Executive Officer was Florida Bar member Scott W. Rothstein ("Rothstein") who, together with Florida Bar member Stuart A. Rosenfeldt, each owned a 50% percent interest in the Debtor.

16.     By Order of the Florida Supreme Court dated November 25, 2009, Rothstein was permanently disbarred as a member of the Florida Bar for misappropriating trust fund monies as part of a several hundred million dollar Ponzi scheme described in more detail below (the

---

[2] Frank Preve and Jack Simony are not joined as defendants in this action.  The Trustee reserves all rights to assert claims against Mr. Preve, Mr. Simony or any other party for claims which may arise from the Regent Transfers or otherwise.

"Rothstein Ponzi Scheme" or "Ponzi Scheme").

17.     On January 25, 2010, Rothstein pled guilty to Conspiracy to Violate the RICO Act, Conspiracy to Commit Money Laundering, Conspiracy to Commit Mail Fraud and Wire Fraud, and Wire Fraud in a criminal proceeding arising from his involvement in the Ponzi Scheme.  On June 9, 2010, he was sentenced to fifty years imprisonment for his crimes.

18.     As set forth in the Plea Agreement filed in the criminal proceeding styled *United States of America v. Scott W. Rothstein*, United States District Court for the Southern District of Florida, Case Number 0:09-cr-60331-JIC [DE 69], Rothstein conspired with others to use RRA as a criminal enterprise in order to conduct a pattern of racketeering activity resulting in violations of mail fraud, wire fraud, money laundering and conspiracy statutes from in or about 2005 through in or about November, 2009.

19.     Rothstein's crimes primarily involved the solicitation of investments in and the sale of fraudulent and fictitious structured settlements purportedly between certain of the Debtor's clients and third parties.

20.     Specifically, Rothstein represented to prospective investors that: (i) certain of RRA's clients had settled whistleblower and employment discrimination claims against third party/putative defendants prior to the commencement of litigation; (ii) the third party/putative defendants had paid the settlement proceeds into RRA's financial institution accounts; and (iii) the settlements provided for disbursement of the proceeds to RRA's clients over an extended period of time, subject to strict confidentiality provisions prohibiting the disclosure of the identities of the parties.

21.     Rothstein further represented to prospective investors that they could "purchase" by assignments these streams of settlement proceeds disbursed from RRA's financial institution

accounts from certain of RRA's clients in exchange for substantially discounted lump sump payments, thereby profiting on the yield between the lump sum payment and the total settlement proceeds (the "Confidential Settlements"). The yields were enormous, at times as much as 600%, a red flag that the deal was too good to be true.

22.     Rothstein provided prospective investors with a package of documents, including a copy of a redacted contingency fee agreement between RRA and RRA's purported client, a copy of a redacted settlement agreement between RRA's purported client and the third party/putative defendant, a sale and transfer agreement, an acknowledgement of assignment/purchase of settlement proceeds agreement, a guaranty executed by Rothstein personally and on behalf of RRA, a defense agreement, a copy of a redacted wire transfer confirmation purporting to evidence payment of the settlement proceeds into RRA's financial institution account, and correspondence detailing the transaction on RRA's letterhead (collectively referred to herein as the "Confidential Settlement Documents").

23.     In truth, Rothstein, in furtherance of his massive Ponzi Scheme, falsified the existence of the client, falsified the existence of the defendant, falsified the existence of the settlement, falsified the existence of the settlement proceeds, falsified the Confidential Settlement Documents, looted RRA and utilized investor funds and RRA client funds to repay earlier investors and for lavish personal expenditures. RRA, at Rothstein's direction, and at all times, exercised dominion and control of all of the transferred funds at issue in this case.

**B.     The Funds Join the Show**

24.     In or about early 2008, Rothstein was soliciting buyers for the sale of the Confidential Settlements from largely unregulated hedge funds and "fund of funds," or so-called "feeder funds." He utilized a number of entities under the "Banyon" umbrella (believed to be

seven), including Banyon Funding, LLC, Banyon Investments, LLC, and Banyon Resources, LLC (collectively, the "Banyon Funding Entities") as the vehicle to solicit purchases of the Confidential Settlements. The Banyon funds are owned and controlled by George Levin. Frank Preve was the person responsible for managing Banyon's investments in the purported Confidential Settlements.

25.     After borrowing the money from the Funds, Banyon, in turn, purchased a substantial number of the Confidential Settlements. The Funds agreed to lend Banyon over $250 million dollars' worth of revolving loans for the purpose of Banyon acquiring settlement proceeds. In total, the Funds advanced approximately $441 million, in aggregate on a revolving basis, to RRA through the Banyon Funding Entities to purchase settlement proceeds. Ultimately, the Funds received repayments from RRA, through the Banyon Funding Entities, of approximately $420 million.

26.     The Funds were sophisticated investors who purported to conduct their own diligence of RRA and the Confidential Settlements both before and during the period in question. Their investigation revealed a significant number of red flags with Rothstein's Confidential Settlement business, facts which would have been apparent to any reasonable investor, indicating that Rothstein was involved in a fraud.

27.     As an example, in or about June 2008, Defendants obtained an investigative report from Kroll Associates, Inc. ("Kroll"), respecting **"certain individuals and business entities" involved in Rothstein's Confidential Settlement scheme. Kroll investigated and reported that it had "[i]nterviewed several sources in the past few weeks. All sources deemed knowledgeable of local litigation believed that Rothstein's firm could not have amassed settlements totaling in the $50 to $100 million range."** (emphasis added).

28.     Despite Kroll's report that there was no evidence of RRA having generated such settlements, the Funds went forward, apparently blinded to experience and reason by the incredible returns paid on their investments.

29.     In aggregate, over a period of approximately one year (but in the case of Level 3, mere months), the Funds channeled their investors' funds to the Debtor for the specific purpose of funding discounted lump-sum payments to the Debtor's putative clients and profiting on spectacular returns derived from unbelievable rates of interest and equity returns when the purported full settlement proceeds were released.

30.     The Funds' aggregate outstanding investment peaked on January 2, 2009; at which point they had advanced $344 million and received repayment of $161 million, representing a maximum aggregate exposure of $183 million.  From this point forward, the Funds gradually reduced their exposure in the Rothstein Ponzi.

31.     By December 2008, the Funds were openly questioning their investment in the Rothstein Ponzi Scheme.  Indeed, on December 14, 2008, Jack Simony wrote Murray Huberfeld to express concern "[w]ith back to back articles in the news between Peters [sic], Drier, and now Madoff one would have to be a crazy person not to have his confidence shaken in just about anything short of a T-Bill."

**C.      The Regent Side-Deal**

32.     The Regent Side-Deal was a one-time investment in the Ponzi scheme engineered by Preve as a means to give Regent the ability to purchase a purported Confidential Settlement for $11,000,000.00 and be repaid $22,000,000.00 within six months.  The Regent Side-Deal bore an annual rate of interest of over 437.1%.

33.     As a result of their management and involvement with the Funds, Defendants

Murray Huberfeld, Mark Nordlicht, and David Bodner had knowledge of the Funds' due diligence and investment strategy. In December 2009, they knew the Funds had grown uncomfortable with their exposure in the Rothstein Ponzi Scheme and were planning how to withdraw the Funds from the scheme. Nonetheless, ignoring their fiduciary duties to the Funds which they controlled and operated, the Regent Side-Deal was concocted to facilitate the Funds' safe exit while at the same time paying Regent a ridiculously high rate of return as compensation for the risks associated with keeping the Ponzi alive to provide the Funds with a safe exit, and enriching the Funds' principals at the expense of the Funds and later investors in the Ponzi Scheme.

34.     While the Funds were withdrawing from the Ponzi scheme by manipulating their funding to finance smaller settlements so that the repayment stream from prior settlements drastically exceeded the amounts funded on "new deals," the Regent Side-Deal was conceived. In addition, the cash-infusion provided by the Regent Side-Deal allowed Rothstein to attempt to find new investors to enable him to pay back the Funds.

35.     On December 2, 2008, the first evidence of the Regent Side-Deal appears in an e-mail, subject line: Regent Capital Partners, to Scott Rothstein from Frank Preve. Preve's e-mail was sent using his alias e-mail account (gsteinbach@sfsfunding.com) associated with SFS Funding, which is an entity Preve formed to receive commissions on side deals.

36.     Simultaneous with Simony's reconsideration of the need for further diligence because of the Madoff, Petters and Drier Ponzi schemes, among others, the Regent Side-Deal was set in motion. Through their wives, Murray Huberfeld, Mark Nordlicht and David Bodner directed the formation of Regent for the sole purpose of side-deal. The Regent Side Deal was extraordinary, vastly exceeding the return on investment obtained by the Funds on any prior

settlement, providing for Regent to advance $11,000,000.00 in exchange for repayment of $22,000,000.00 over six months.

37.     In addition to their knowledge that they were engaged in an improper transaction with respect to their fiduciary obligations to the Funds' investors, the Defendants knew that Preve was breaching his fiduciary obligations to Banyon by orchestrating the Regent Side-Deal. Significantly, although the Regent Side-Deal was papered on December 2, 2008, Regent did not actually fund the deal until January 2, 2009, just days prior to receiving the first scheduled return payment which was made January 7, 2009.

38.     Defendant SFS Funding, an entity controlled by Preve, received $2,750,000 directly from RRA and $1,833,333 from Regent for, among other things, Preve's role in orchestrating the Regent Side-Deal.

**D.      Rothstein Defaults, the Funds Stop Lending and Regent is Repaid.**

39.     On or about April 10, 2009, representatives of the Funds and Rothstein had a "crisis" meeting at RRA's offices to discuss Rothstein's failure to make timely payments due to Banyon for the benefit of the Funds. These defaults were further evidence that the investments previously purchased were a fraud since the money for these payments was supposed to already be in restricted bank accounts available only to the Defendants.

40.     The Funds which had essentially ceased funding and accelerated repayments in or about March 2009, thereafter extracted approximately $98 million in transfers from the Debtor in the period March 20, 2009 through October 27, 2009 (the "Forbearance Transfers"). The Forbearance Transfers bore no relationship to the actual payments otherwise due to the Defendant Lenders under the purported Confidential Settlement Documents. And the Funds withheld declaring a default in order to receive these transfers.

41.     By April 7, 2009, Defendants Murray Huberfeld, Mark Nordlicht and David Bodner were all aware that Rothstein had defaulted and that the Confidential Settlements were a total sham.  Indeed, even though Rothstein did not make payments due under prior settlements by creating the ruse that the Florida Bar had frozen all of RRA's trust accounts, the Regent Side-Deal continued to receive scheduled monthly payments as required under the deal documents. From this date forward, Regent received at least, an additional $7,333,333.35 which it promptly disbursed for the benefit of the Defendants.

42.     Murray Huberfeld and David Bodner's willingness to invest in a fraud should come as no surprise.  Indeed, Murray Huberfeld who, upon information and belief, was the individual "pulling the strings" respecting the Funds' involvement in the Rothstein Ponzi, had been involved in SEC investigations involving alleged "pump and dump" scams.  In fact, Murray Huberfeld together with David Bodner and their New York investment firm, Broad Capital, collectively disgorged approximately $4.7 million as a result of the collapse of INCONNECT.

**E.     The Avoidable Transfers at Issue**

43.     The following transfers made by RRA are at issue in this action:

(a)     $18,333,333.35  to Regent Capital from January 7, 2009 through May 7, 2009 (the "Regent Transfers")

(b)     $6,420,943.50 of the Regent Capital Transfers which were subsequently transferred to Murray Huberfeld and Laura Huberfeld for the benefit of the Huberfelds between January 12, 2009 and October 22, 2009 (the "Huberfeld Transfers");

(c)     $2,985,778.00 of the Regent Capital Transfers which were subsequently transferred to Dahlia Kalter for the benefit of the Nordlichts between January 12, 2009 and March 19, 2009 (the "Nordlicht Transfers");

(d)     $6,420,943.50 of the Regent Capital Transfers which were subsequently transferred to Naomi Bodner for the benefit of the Bodners between January 12, 2009 and October 22, 2009 (the "Bodner Transfers"); and

(e)     $668,666.00 of the Regent Capital Transfers which were subsequently transferred to the Bodner Family Foundation for the benefit of the Bodners on January 14, 2009 (the "Bodner Foundation Transfer").

44.     Schedules of the Regent Transfers, Huberfeld Transfers, the Nordlicht Transfers, the Bodner Transfers and the Bodner Foundation Transfer, are attached hereto as Exhibits A, B, C, D and E.

45.     Additionally, on May 8, 2009, Regent transferred $1,833,333 of the Regent Transfers to SFS Funding and the Debtor separately transferred to SFS Funding $1,400,000 on June 11, 2009, $750,000 on August 5, 2009, and $600,000 on August 12, 2011 (collectively, the "SFS Transfers," with those SFS Transfers made within 90 days of the Petition Date more specifically defined as the "90 Day SFS Preferential Transfers").  A schedule of the SFS Transfers is annexed hereto as Exhibit F.  Upon information and belief, the SFS Transfers were made for the benefit of Frank Preve and Jack Simony labeled as "commissions" for structuring the Regent Side-Deal.

**F.     Conditions Precedent**

46.     All conditions precedent to the institution of this action have been performed, have occurred, have been waived or have otherwise been excused.

## COUNT I
### Action to Avoid and Recover Fraudulent Transfers Pursuant
### to 11 U.S.C. §§ 544 and 548 and Chapter 726 of the Florida Statutes
### (Against Defendant Regent)

The Trustee sues Defendant Regent and alleges:

47.      The Trustee repeats and realleges paragraphs 1 through 46 of his Complaint as if fully set forth herein.

48.      Pursuant to 11 U.S.C. § 548 and/or 11 U.S.C. § 544 and Chapter 726 of the Florida Statutes, a Trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within 2 years (under Section 548 of the Bankruptcy Code) and 4 years (under Chapter 726 of the Florida Statutes) before the date of the filing of the petition, if the debtor voluntarily or involuntarily – (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or (B)(i) to the extent applicable, received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

49.      Pursuant to 11 U.S.C. § 550, in a fraudulent transfer action commenced under Sections 544 and 548 of the Bankruptcy Code and Chapter 726 of the Florida Statutes, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so

orders, the value of such property, from – (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; (2) any immediate or mediate transferee of such initial transferee; or (3) any commercial conduit lacking good faith in receipt of such property.

50.     The Regent Transfers as reflected in the attached Exhibit A constitute transfers of an interest in property of the Debtor to Regent within two years (under Section 548 of the Bankruptcy Code) and four years (under Chapter 726 of the Florida Statutes) prior to the Petition Date.

51.     The Regent Transfers were made with actual intent to hinder, delay, or defraud creditors of the Debtor.  Among other badges of fraud at or near the time of the Regent Transfers: (i) Rothstein was utilizing the Debtor to conduct the Ponzi Scheme and (ii) the Debtor was not paying its debts as they became due, (iii) the Debtor was commingling trust funds, funds from operations and investor funds and (iv) the Debtor was transferring funds to Rothstein, or at his direction, for the payment of personal expenses for which the Debtor received no benefit.

52.     As a result of the above, the Trustee can avoid the Regent Transfers pursuant to Sections 544 and 548 of the Bankruptcy Code and Chapter 726 of the Florida Statutes, and recover the value thereof for the benefit of the estate pursuant to Section 550 of the Bankruptcy Code.

WHEREFORE, the Trustee respectfully requests this Court to enter a judgment against the Defendant, REGENT CAPITAL PARTNERS, LLC, that: (i) avoids the Regent Transfers to Regent as reflected in the attached Exhibit A and recovers same for the benefit of the estate; (ii) awards to the Trustee the amount or value of the Regent Transfers, plus pre-judgment and post-judgment interest and costs; (iii) disallows any claim that Regent may have against the Debtor; and (iv) awards any other relief the Court deems appropriate.

**COUNT II**
**Action for Turnover of Property of the Estate**
**and Demand for an Accounting Pursuant to 11 U.S.C. § 542**
**(Against Defendant Regent)**

The Trustee sues Defendant Regent and alleges:

53.     The Trustee repeats and realleges Count I of his Complaint as if fully set forth herein.

54.     This is an action for turnover of property of the estate pursuant to Section 542 of the Bankruptcy Code and a demand for an accounting in accordance therewith.

55.     The Regent Transfers constitute property of the estate to be recovered and administered by the Trustee pursuant to Section 541 of the Bankruptcy Code.

56.     As a result of the foregoing, pursuant to Section 542 of the Bankruptcy Code, the Trustee is entitled to the immediate payment and turnover from Regent of any and all transfers made by the Debtor, directly or indirectly, to Regent.

57.     The Trustee is also entitled to an accounting of all transfers received by Regent, directly or indirectly, from the Debtor.

WHEREFORE, the Trustee respectfully requests this Court to enter judgment against the Defendant, REGENT CAPITAL PARTNERS, LLC: (i) ordering it to turnover to the Trustee all funds and other things of value that are the subject of the Regent Transfers that are the subject of Count I above; (ii) ordering Regent to account to the Trustee regarding the status, use and current location of such funds and assets; (iii) entering a judgment for the value of the assets that comprise such funds and other things of value, including pre-judgment and post-judgment interest and costs; and (iv) for any other relief the Court deems appropriate.

## COUNT III
## Action for Constructive Trust
### (Against Defendant Regent)

The Trustee sues Defendant Regent and alleges:

58.     The Trustee repeats and realleges Count I his Complaint as if fully set forth herein.

59.     The Trustee is the legal title holder to all property of RRA.

60.     The Regent Transfers were effected by RRA fraudulently or alternatively, without fraud but retained by Regent under inequitable circumstances.

61.     As the beneficiary of the Regent Transfers, Regent knew or should have known that the Regent Transfers were improper.

62.     Regent has been unjustly enriched to the detriment of RRA, and as a result, a constructive trust should be established against the Regent Transfers and all proceeds of the Regent Transfers.

WHEREFORE, the Trustee respectfully requests this Court to enter a judgment against the Defendant, REGENT CAPITAL PARTNERS, LLC, for imposition of a constructive trust lien to be established against the Regent Transfers and all proceeds of the Regent Transfers, for damages and all such other relief as this court deems just and appropriate.

## COUNT IV
## Action for Equitable Lien
### (Against Defendant Regent)

The Trustee sues Defendant Regent and alleges:

63.     The Trustee repeats and realleges Count I of his Complaint as if fully set forth herein.

64.     The Trustee is the legal title holder to all property of RRA.

65.     The Regent Transfers were effected by RRA fraudulently or egregiously, or alternatively, without fraud but retained by Regent under inequitable circumstances.

66.     As the beneficiary of the Regent Transfers, Regent knew or should have known that the Regent Transfers were improper.

67.     Regent has been unjustly enriched to the detriment of RRA, and as a result, an equitable lien should be established against all realty and personalty acquired by Regent directly traceable to the Regent Transfers and all proceeds of the Regent Transfers.

WHEREFORE, the Trustee respectfully requests this Court to enter a judgment against the Defendant, REGENT CAPITAL PARTNERS, LLC, for imposition of an equitable lien to be established against all realty and personalty directly traceable from the Regent Transfers and all proceeds of the Regent Transfers, for damages and all such other relief as this court deems just and appropriate.

**COUNT V**
**Action to Avoid and Recover Fraudulent Transfers Pursuant**
**to 11 U.S.C. §§ 544 and 548 and Chapter 726 of the Florida Statutes**
**(Against Defendants Laura Huberfeld and Murray Huberfeld)**

The Trustee sues Defendants Laura Huberfeld and Murray Huberfeld and alleges:

68.     The Trustee repeats and realleges paragraphs 1 through 46 of his Complaint as if fully set forth herein.

69.     Pursuant to 11 U.S.C. § 548 and/or 11 U.S.C. § 544 and Chapter 726 of the Florida Statutes, a Trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within 2 years (under Section 548 of the Bankruptcy Code) and 4 years (under Chapter 726 of the Florida Statutes) before the date of the filing of the petition, if the debtor voluntarily or involuntarily – (A) made such

transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or (B)(i) to the extent applicable, received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

70.     Pursuant to 11 U.S.C. § 550, in a fraudulent transfer action commenced under Sections 544 and 548 of the Bankruptcy Code and Chapter 726 of the Florida Statutes, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from – (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; (2) any immediate or mediate transferee of such initial transferee; or (3) any commercial conduit lacking good faith in receipt of such property.

71.     The Huberfeld Transfers as reflected in the attached Exhibit B constitute transfers of an interest in property of the Debtor to the Huberfelds within two years (under Section 548 of the Bankruptcy Code) and four years (under Chapter 726 of the Florida Statutes) prior to the Petition Date.

72.     The Huberfeld Transfers were made with actual intent to hinder, delay, or defraud creditors of the Debtor.  Among other badges of fraud at or near the time of the Huberfeld Transfers: (i) Rothstein was utilizing the Debtor to conduct the Ponzi Scheme and (ii) the Debtor was not paying its debts as they became due, (iii) the Debtor was commingling trust funds, funds

18

from operations and investor funds and (iv) the Debtor was transferring funds to Rothstein, or at his direction, for the payment of personal expenses for which the Debtor received no benefit.

73.    As a result of the above, the Trustee can avoid the Huberfeld Transfers pursuant to Sections 544 and 548 of the Bankruptcy Code and Chapter 726 of the Florida Statutes, and recover the value thereof for the benefit of the estate pursuant to Section 550 of the Bankruptcy Code.

WHEREFORE, the Trustee respectfully requests this Court to enter judgment, jointly and severally, against the Defendants, LAURA HUBERFELD AND MURRAY HUBERFELD, that: (i) avoids the Huberfeld Transfers to the Huberfelds as reflected in the attached Exhibit B and recovers same for the benefit of the estate; (ii) awards to the Trustee the amount or value of the Huberfeld Transfers, plus pre-judgment and post-judgment interest and costs; (iii) disallows any claim that the Huberfelds may have against the Debtor; and (iv) awards any other relief the Court deems appropriate.

**COUNT VI**
**<u>Action for Turnover of Property of the Estate</u>**
**<u>and Demand for an Accounting Pursuant to 11 U.S.C. § 542</u>**
**(Against Defendants Laura Huberfeld and Murray Huberfeld)**

The Trustee sues Defendants Laura Huberfeld and Murray Huberfeld and alleges:

74.    The Trustee repeats and realleges Count V of his Complaint as if fully set forth herein.

75.    This is an action for turnover of property of the estate pursuant to Section 542 of the Bankruptcy Code and a demand for an accounting in accordance therewith.

76.    The Huberfeld Transfers constitute property of the estate to be recovered and administered by the Trustee pursuant to Section 541 of the Bankruptcy Code.

19

77.     As a result of the foregoing, pursuant to Section 542 of the Bankruptcy Code, the Trustee is entitled to the immediate payment and turnover from the Huberfelds of any and all transfers made by the Debtor, directly or indirectly, to the Huberfelds

78.     The Trustee is also entitled to an accounting of all transfers received by the Huberfelds, directly or indirectly, from the Debtor.

WHEREFORE, the Trustee respectfully requests this Court to enter judgment, jointly and severally, against the Defendants, LAURA HUBERFELD AND MURRAY HUBERFELD: (i) ordering it to turnover to the Trustee all funds and other things of value that are the subject of the Huberfeld Transfers that are the subject of Count V above; (ii) ordering the Huberfelds to account to the Trustee regarding the status, use and current location of such funds and assets; (iii) entering a judgment for the value of the assets that comprise such funds and other things of value, including pre-judgment and post-judgment interest and costs; and (iv) for any other relief the Court deems appropriate.

### COUNT VII
### Action for Constructive Trust
### (Against Defendants Laura Huberfeld and Murray Huberfeld)

The Trustee sues Defendants Laura Huberfeld and Murray Huberfeld and alleges:

79.     The Trustee repeats and realleges Count V his Complaint as if fully set forth herein.

80.     The Trustee is the legal title holder to all property of RRA.

81.     The Huberfeld Transfers were effected by RRA fraudulently or alternatively, without fraud but retained by the Huberfelds under inequitable circumstances.

82.     As the beneficiary of the Huberfeld Transfers, the Huberfelds knew or should have known that the Huberfeld Transfers were improper.

83.     The Huberfelds have been unjustly enriched to the detriment of RRA, and as a result, a constructive trust should be established against the Huberfeld Transfers and all proceeds of the Huberfeld Transfers.

WHEREFORE, the Trustee respectfully requests this Court to enter a judgment, jointly and severally, against the Defendants, LAURA HUBERFELD AND MURRAY HUBERFELD, for imposition of a constructive trust lien to be established against the Huberfeld Transfers and all proceeds of the Huberfeld Transfers, for damages and all such other relief as this court deems just and appropriate.

### COUNT VIII
### Action for Equitable Lien
### (Against Defendants Laura Huberfeld and Murray Huberfeld)

The Trustee sues Defendants Laura Huberfeld and Murray Huberfeld and alleges:

84.     The Trustee repeats and realleges Count V of his Complaint as if fully set forth herein.

85.     The Trustee is the legal title holder to all property of RRA.

86.     The Huberfeld Transfers were effected by RRA fraudulently or egregiously, or alternatively, without fraud but retained by the Huberfelds under inequitable circumstances.

87.     As the beneficiary of the Huberfeld Transfers, the Huberfelds knew or should have known that the Huberfeld Transfers were improper.

88.     The Huberfelds have been unjustly enriched to the detriment of RRA, and as a result, an equitable lien should be established against all realty and personalty acquired by the Huberfelds directly traceable to the Huberfeld Transfers and all proceeds of the Huberfeld Transfers.

WHEREFORE, the Trustee respectfully requests this Court to enter a judgment, jointly and severally, against the Defendants, LAURA HUBERFELD AND MURRAY HUBERFELD, for imposition of an equitable lien to be established against all realty and personalty directly traceable from the Huberfeld Transfers and all proceeds of the Huberfeld Transfers, for damages and all such other relief as this court deems just and appropriate.

**COUNT IX**
**Action to Avoid and Recover Fraudulent Transfers Pursuant**
**to 11 U.S.C. §§ 544 and 548 and Chapter 726 of the Florida Statutes**
**(Against Defendants Dahlia Kalter and Mark Nordlicht)**

The Trustee sues Defendants Dahlia Kalter and Mark Nordlicht and alleges:

89.     The Trustee repeats and realleges paragraphs 1 through 46 of his Complaint as if fully set forth herein.

90.     Pursuant to 11 U.S.C. § 548 and/or 11 U.S.C. § 544 and Chapter 726 of the Florida Statutes, a Trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within 2 years (under Section 548 of the Bankruptcy Code) and 4 years (under Chapter 726 of the Florida Statutes) before the date of the filing of the petition, if the debtor voluntarily or involuntarily – (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or (B)(i) to the extent applicable, received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an

unreasonably small capital; or (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

91.     Pursuant to 11 U.S.C. § 550, in a fraudulent transfer action commenced under Sections 544 and 548 of the Bankruptcy Code and Chapter 726 of the Florida Statutes, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from – (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; (2) any immediate or mediate transferee of such initial transferee; or (3) any commercial conduit lacking good faith in receipt of such property.

92.     The Nordlicht Transfers as reflected in the attached Exhibit C constitute transfers of an interest in property of the Debtor to the Nordlichts within two years (under Section 548 of the Bankruptcy Code) and four years (under Chapter 726 of the Florida Statutes) prior to the Petition Date.

93.     The Nordlicht Transfers were made with actual intent to hinder, delay, or defraud creditors of the Debtor.  Among other badges of fraud at or near the time of the Nordlicht Transfers: (i) Rothstein was utilizing the Debtor to conduct the Ponzi Scheme and (ii) the Debtor was not paying its debts as they became due, (iii) the Debtor was commingling trust funds, funds from operations and investor funds and (iv) the Debtor was transferring funds to Rothstein, or at his direction, for the payment of personal expenses for which the Debtor received no benefit.

94.     As a result of the above, the Trustee can avoid the Nordlicht Transfers pursuant to Sections 544 and 548 of the Bankruptcy Code and Chapter 726 of the Florida Statutes, and recover the value thereof for the benefit of the estate pursuant to Section 550 of the Bankruptcy Code.

WHEREFORE, the Trustee respectfully requests this Court to enter judgment, jointly and severally, against the Defendants, DAHLIA KALTER AND MARK NORDLICHT, that: (i) avoids the Nordlicht Transfers to the Nordlichts as reflected in the attached Exhibit C and recovers same for the benefit of the estate; (ii) awards to the Trustee the amount or value of the Nordlicht Transfers, plus pre-judgment and post-judgment interest and costs; (iii) disallows any claim that the Nordlichts may have against the Debtor; and (iv) awards any other relief the Court deems appropriate.

### COUNT X
### <u>Action for Turnover of Property of the Estate</u>
### <u>and Demand for an Accounting Pursuant to 11 U.S.C. § 542</u>
### (Against Defendants Dahlia Kalter and Mark Nordlicht)

The Trustee sues Defendants Dahlia Kalter and Mark Nordlicht and alleges:

95.     The Trustee repeats and realleges Count IX of his Complaint as if fully set forth herein.

96.     This is an action for turnover of property of the estate pursuant to Section 542 of the Bankruptcy Code and a demand for an accounting in accordance therewith.

97.     The Nordlicht Transfers constitute property of the estate to be recovered and administered by the Trustee pursuant to Section 541 of the Bankruptcy Code.

98.     As a result of the foregoing, pursuant to Section 542 of the Bankruptcy Code, the Trustee is entitled to the immediate payment and turnover from the Nordlichts of any and all transfers made by the Debtor, directly or indirectly, to the Nordlichts.

99.     The Trustee is also entitled to an accounting of all transfers received by the Nordlichts, directly or indirectly, from the Debtor.

WHEREFORE, the Trustee respectfully requests this Court to enter judgment, jointly and severally, against the Defendants, DAHLIA KALTER AND MARK NORDLICHT: (i) ordering the Nordlichts to turnover to the Trustee all funds and other things of value that are the subject of the Nordlicht Transfers that are the subject of Count IX above; (ii) ordering the Nordlichts to account to the Trustee regarding the status, use and current location of such funds and assets; (iii) entering a judgment for the value of the assets that comprise such funds and other things of value, including pre-judgment and post-judgment interest and costs; and (iv) for any other relief the Court deems appropriate.

## COUNT XI
### Action for Constructive Trust
### (Against Defendants Dahlia Kalter and Mark Nordlicht)

The Trustee sues Defendants Dahlia Kalter and Mark Nordlicht and alleges:

100.    The Trustee repeats and realleges Count IX his Complaint as if fully set forth herein.

101.    The Trustee is the legal title holder to all property of RRA.

102.    The Nordlicht Transfers were effected by RRA fraudulently or alternatively, without fraud but retained by the Nordlichts under inequitable circumstances.

103.    As the beneficiary of the Nordlicht Transfers, the Nordlichts knew or should have known that the Nordlicht Transfers were improper.

104.    The Nordlichts have been unjustly enriched to the detriment of RRA, and as a result, a constructive trust should be established against the Nordlicht Transfers and all proceeds of the Nordlicht Transfers.

WHEREFORE, the Trustee respectfully requests this Court to enter a judgment, jointly and severally, against the Defendants, DAHLIA KALTER AND MARK NORDLICHT, for

imposition of a constructive trust lien to be established against the Nordlicht Transfers and all proceeds of the Nordlicht Transfers, for damages and all such other relief as this court deems just and appropriate.

**COUNT XII**
**Action for Equitable Lien**
**(Against Defendants Dahlia Kalter and Mark Nordlicht)**

The Trustee sues Defendants Dahlia Kalter and Mark Nordlicht and alleges:

105.    The Trustee repeats and realleges Count IX of his Complaint as if fully set forth herein.

106.    The Trustee is the legal title holder to all property of RRA.

107.    The Nordlicht Transfers were effected by RRA fraudulently or egregiously, or alternatively, without fraud but retained by the Nordlichts under inequitable circumstances.

108.    As the beneficiary of the Nordlicht Transfers, the Nordlichts knew or should have known that the Nordlicht Transfers were improper.

109.    The Nordlichts have been unjustly enriched to the detriment of RRA, and as a result, an equitable lien should be established against all realty and personalty acquired by the Nordlichts directly traceable to the Nordlicht Transfers and all proceeds of the Nordlicht Transfers.

WHEREFORE, the Trustee respectfully requests this Court to enter a judgment, jointly and severally, against the Defendants, DAHLIA KALTER AND MARK NORDLICHT, for imposition of an equitable lien to be established against all realty and personalty directly traceable from the Nordlicht Transfers and all proceeds of the Nordlicht Transfers, for damages and all such other relief as this court deems just and appropriate.

26

## COUNT XIII
### Action to Avoid and Recover Fraudulent Transfers Pursuant
### to 11 U.S.C. §§ 544 and 548 and Chapter 726 of the Florida Statutes
### (Against Defendants Naomi Bodner and David Bodner)

The Trustee sues Defendants Naomi Bodner and David Bodner and alleges:

110.     The Trustee repeats and realleges paragraphs 1 through 46 of his Complaint as if fully set forth herein.

111.     Pursuant to 11 U.S.C. § 548 and/or 11 U.S.C. § 544 and Chapter 726 of the Florida Statutes, a Trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within 2 years (under Section 548 of the Bankruptcy Code) and 4 years (under Chapter 726 of the Florida Statutes) before the date of the filing of the petition, if the debtor voluntarily or involuntarily – (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or (B)(i) to the extent applicable, received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

112.     Pursuant to 11 U.S.C. § 550, in a fraudulent transfer action commenced under Sections 544 and 548 of the Bankruptcy Code and Chapter 726 of the Florida Statutes, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so

orders, the value of such property, from – (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; (2) any immediate or mediate transferee of such initial transferee; or (3) any commercial conduit lacking good faith in receipt of such property.

113.     The Bodner Transfers as reflected in the attached Exhibit D constitute transfers of an interest in property of the Debtor to the Bodners within two years (under Section 548 of the Bankruptcy Code) and four years (under Chapter 726 of the Florida Statutes) prior to the Petition Date.

114.     The Bodner Transfers were made with actual intent to hinder, delay, or defraud creditors of the Debtor.  Among other badges of fraud at or near the time of the Bodner Transfers: (i) Rothstein was utilizing the Debtor to conduct the Ponzi Scheme and (ii) the Debtor was not paying its debts as they became due, (iii) the Debtor was commingling trust funds, funds from operations and investor funds and (iv) the Debtor was transferring funds to Rothstein, or at his direction, for the payment of personal expenses for which the Debtor received no benefit.

115.     As a result of the above, the Trustee can avoid the Bodner Transfers pursuant to Sections 544 and 548 of the Bankruptcy Code and Chapter 726 of the Florida Statutes, and recover the value thereof for the benefit of the estate pursuant to Section 550 of the Bankruptcy Code.

WHEREFORE, the Trustee respectfully requests this Court to enter judgment, jointly and severally, against the Defendants, NAOMI BODNER AND DAVID BODNER, that: (i) avoids the Bodner Transfers to the Bodners as reflected in the attached Exhibit D and recovers same for the benefit of the estate; (ii) awards to the Trustee the amount or value of the Bodner Transfers, plus pre-judgment and post-judgment interest and costs; (iii) disallows any claim that the

Bodners may have against the Debtor; and (iv) awards any other relief the Court deems appropriate.

**COUNT XIV**
**Action for Turnover of Property of the Estate**
**and Demand for an Accounting Pursuant to 11 U.S.C. § 542**
**(Against Defendants Naomi Bodner and David Bodner)**

The Trustee sues Defendants Naomi Bodner and David Bodner and alleges:

116.     The Trustee repeats and realleges Count XIII of his Complaint as if fully set forth herein.

117.     This is an action for turnover of property of the estate pursuant to Section 542 of the Bankruptcy Code and a demand for an accounting in accordance therewith.

118.     The Bodner Transfers constitute property of the estate to be recovered and administered by the Trustee pursuant to Section 541 of the Bankruptcy Code.

119.     As a result of the foregoing, pursuant to Section 542 of the Bankruptcy Code, the Trustee is entitled to the immediate payment and turnover from the Bodners of any and all transfers made by the Debtor, directly or indirectly, to the Bodners.

120.     The Trustee is also entitled to an accounting of all transfers received by the Bodners, directly or indirectly, from the Debtor.

WHEREFORE, the Trustee respectfully requests this Court to enter judgment, jointly and severally, against the Defendant**s,** NAOMI BODNER AND DAVID BODNER: (i) ordering the Bodners to turnover to the Trustee all funds and other things of value that are the subject of the Bodner Transfers that are the subject of Count XIII above; (ii) ordering the Bodners to account to the Trustee regarding the status, use and current location of such funds and assets; (iii) entering a judgment for the value of the assets that comprise such funds and other things of value, including

29

pre-judgment and post-judgment interest and costs; and (iv) for any other relief the Court deems appropriate.

**COUNT XV**
**<u>Action for Constructive Trust</u>**
**(Against Defendants Naomi Bodner and David Bodner)**

The Trustee sues Defendants Naomi Bodner and David Bodner and alleges:

121.    The Trustee repeats and realleges Count XIII his Complaint as if fully set forth herein.

122.    The Trustee is the legal title holder to all property of RRA.

123.    The Bodner Transfers were effected by RRA fraudulently or alternatively, without fraud but retained by the Bodners under inequitable circumstances.

124.    As the beneficiary of the Bodner Transfers, the Bodners knew or should have known that the Bodner Transfers were improper.

125.    The Bodners have been unjustly enriched to the detriment of RRA, and as a result, a constructive trust should be established against the Bodner Transfers and all proceeds of the Bodner Transfers.

WHEREFORE, the Trustee respectfully requests this Court to enter a judgment, jointly and severally, against the Defendants, NAOMI BODNER AND DAVID BODNER, for imposition of a constructive trust lien to be established against the Bodner Transfers and all proceeds of the Bodner Transfers, for damages and all such other relief as this court deems just and appropriate.

**COUNT XVI**
**Action for Equitable Lien**
**(Against Defendants Naomi Bodner and David Bodner)**

The Trustee sues Defendants Naomi Bodner and David Bodner and alleges:

126.     The Trustee repeats and realleges Count XIII of his Complaint as if fully set forth herein.

127.     The Trustee is the legal title holder to all property of RRA.

128.     The Bodner Transfers were effected by RRA fraudulently or egregiously, or alternatively, without fraud but retained by the Bodners under inequitable circumstances.

129.     As the beneficiary of the Bodner Transfers, the Bodners knew or should have known that the Bodner Transfers were improper.

130.     The Bodners have been unjustly enriched to the detriment of RRA, and as a result, an equitable lien should be established against all realty and personalty acquired by the Bodners directly traceable to the Bodner Transfers and all proceeds of the Bodner Transfers.

WHEREFORE, the Trustee respectfully requests this Court to enter a judgment, jointly and severally, against the Defendants, NAOMI BODNER AND DAVID BODNER, for imposition of an equitable lien to be established against all realty and personalty directly traceable from the Bodner Transfers and all proceeds of the Bodner Transfers, for damages and all such other relief as this court deems just and appropriate.

**COUNT XVII**
**Action to Avoid and Recover Fraudulent Transfers Pursuant**
**to 11 U.S.C. §§ 544 and 548 and Chapter 726 of the Florida Statutes**
**(Against Defendants Naomi Bodner, David Bodner and Bodner Family Foundation)**

The Trustee sues Defendants Naomi Bodner, David Bodner and Bodner Family Foundation and alleges:

31

131.     The Trustee repeats and realleges paragraphs 1 through 46 of his Complaint as if fully set forth herein.

132.     Pursuant to 11 U.S.C. § 548 and/or 11 U.S.C. § 544 and Chapter 726 of the Florida Statutes, a Trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within 2 years (under Section 548 of the Bankruptcy Code) and 4 years (under Chapter 726 of the Florida Statutes) before the date of the filing of the petition, if the debtor voluntarily or involuntarily – (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or (B)(i) to the extent applicable, received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

133.     Pursuant to 11 U.S.C. § 550, in a fraudulent transfer action commenced under Sections 544 and 548 of the Bankruptcy Code and Chapter 726 of the Florida Statutes, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from – (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; (2) any immediate or mediate transferee of such initial transferee; or (3) any commercial conduit lacking good faith in receipt of such property.

134.     The Bodner Foundation Transfer as reflected in the attached Exhibit E constitutes

32

a transfer of an interest in property of the Debtor to the Bodners and the Bodner Family Foundation within two years (under Section 548 of the Bankruptcy Code) and four years (under Chapter 726 of the Florida Statutes) prior to the Petition Date.

135.     The Bodner Foundation Transfer was made with actual intent to hinder, delay, or defraud creditors of the Debtor.  Among other badges of fraud at or near the time of the Bodner Foundation Transfer: (i) Rothstein was utilizing the Debtor to conduct the Ponzi Scheme and (ii) the Debtor was not paying its debts as they became due, (iii) the Debtor was commingling trust funds, funds from operations and investor funds and (iv) the Debtor was transferring funds to Rothstein, or at his direction, for the payment of personal expenses for which the Debtor received no benefit.

136.     As a result of the above, the Trustee can avoid the Bodner Foundation Transfer pursuant to Sections 544 and 548 of the Bankruptcy Code and Chapter 726 of the Florida Statutes, and recover the value thereof for the benefit of the estate pursuant to Section 550 of the Bankruptcy Code.

WHEREFORE, the Trustee respectfully requests this Court to enter judgment, jointly and severally, against the Defendants, NAOMI BODNER, DAVID BODNER and BODNER FAMILY FOUNDATION, that: (i) avoids the Bodner Foundation Transfer to the Bodner Family Foundation for the benefit of the Bodners as reflected in the attached Exhibit E and recovers same for the benefit of the estate; (ii) awards to the Trustee the amount or value of the Bodner Foundation Transfer, plus pre-judgment and post-judgment interest and costs; (iii) disallows any claim that the Bodners and the Bodner Family Foundation may have against the Debtor; and (iv) awards any other relief the Court deems appropriate.

## COUNT XVIII
### Action for Turnover of Property of the Estate
### and Demand for an Accounting Pursuant to 11 U.S.C. § 542
#### (Against Defendant Bodner Family Foundation)

The Trustee sues Defendant Bodner Family Foundation and alleges:

137.     The Trustee repeats and realleges Count XVII of his Complaint as if fully set forth herein.

138.     This is an action for turnover of property of the estate pursuant to Section 542 of the Bankruptcy Code and a demand for an accounting in accordance therewith.

139.     The Bodner Foundation Transfer constitutes property of the estate to be recovered and administered by the Trustee pursuant to Section 541 of the Bankruptcy Code.

140.     As a result of the foregoing, pursuant to Section 542 of the Bankruptcy Code, the Trustee is entitled to the immediate payment and turnover from the Bodner Family Foundation of any and all transfers made by the Debtor, directly or indirectly, to the Bodner Family Foundation.

141.     The Trustee is also entitled to an accounting of all transfers received by the Bodner Family Foundation, directly or indirectly, from the Debtor.

WHEREFORE, the Trustee respectfully requests this Court to enter judgment against the Defendant, BODNER FAMILY FOUNDATION: (i) ordering it to turnover to the Trustee all funds and other things of value that are the subject of the Bodner Foundation Transfer that are the subject of Count XVII above; (ii) ordering the Bodner Family Foundation to account to the Trustee regarding the status, use and current location of such funds and assets; (iii) entering a judgment for the value of the assets that comprise such funds and other things of value, including

pre-judgment and post-judgment interest and costs; and (iv) for any other relief the Court deems appropriate.

### COUNT XIX
### Action for Constructive Trust
### (Against Defendant Bodner Family Foundation)

The Trustee sues Defendant Bodner Family Foundation and alleges:

142.     The Trustee repeats and realleges Count XVII of his Complaint as if fully set forth herein.

143.     The Trustee is the legal title holder to all property of RRA.

144.     The Bodner Foundation Transfer was effected by RRA fraudulently or alternatively, without fraud but retained by the Bodner Family Foundation under inequitable circumstances.

145.     As the beneficiary of the Bodner Foundation Transfer, the Bodner Family Foundation knew or should have known that the Bodner Foundation Transfer was improper.

146.     The Bodner Family Foundation has been unjustly enriched to the detriment of RRA, and as a result, a constructive trust should be established against the Bodner Foundation Transfer and all proceeds of the Bodner Foundation Transfer.

WHEREFORE, the Trustee respectfully requests this Court to enter a judgment against the Defendant, BODNER FAMILY FOUNDATION, for imposition of a constructive trust lien to be established against the Bodner Foundation Transfer and all proceeds of the Bodner Foundation Transfer, for damages and all such other relief as this court deems just and appropriate.

**COUNT XX**
**Action for Equitable Lien**
**(Against Defendant Bodner Family Foundation)**

The Trustee sues Defendant Bodner Family Foundation and alleges:

147.     The Trustee repeats and realleges Count XVII of his Complaint as if fully set forth herein.

148.     The Trustee is the legal title holder to all property of RRA.

149.     The Bodner Foundation Transfer was effected by RRA fraudulently or egregiously, or alternatively, without fraud but retained by the Bodner Family Foundation under inequitable circumstances.

150.     As the beneficiary of the Bodner Foundation Transfer, the Bodner Family Foundation knew or should have known that the Bodner Foundation Transfer was improper.

151.     The Bodner Family Foundation has been unjustly enriched to the detriment of RRA, and as a result, an equitable lien should be established against all realty and personalty acquired by the Bodner Family Foundation directly traceable to the Bodner Foundation Transfer and all proceeds of the Bodner Foundation Transfer.

WHEREFORE, the Trustee respectfully requests this Court to enter a judgment against the Defendant, BODNER FAMILY FOUNDATION, for imposition of an equitable lien to be established against all realty and personalty directly traceable from the Bodner Foundation Transfer and all proceeds of the Bodner Foundation Transfer, for damages and all such other relief as this court deems just and appropriate.

## COUNT XXI
### Action to Avoid and Recover Fraudulent Transfers Pursuant to 11 U.S.C. §§ 544 and 548 and Chapter 726 of the Florida Statutes
### (Against Defendant SFS Funding)

The Trustee sues Defendants SFS Capital Funding, LLC and alleges:

152.    The Trustee repeats and realleges paragraphs 1 through 46 of his Complaint as if fully set forth herein.

153.    Pursuant to 11 U.S.C. § 548 and/or 11 U.S.C. § 544 and Chapter 726 of the Florida Statutes, a Trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within 2 years (under Section 548 of the Bankruptcy Code) and 4 years (under Chapter 726 of the Florida Statutes) before the date of the filing of the petition, if the debtor voluntarily or involuntarily – (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or (B)(i) to the extent applicable, received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

154.    Pursuant to 11 U.S.C. § 550, in a fraudulent transfer action commenced under Sections 544 and 548 of the Bankruptcy Code and Chapter 726 of the Florida Statutes, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so

orders, the value of such property, from – (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; (2) any immediate or mediate transferee of such initial transferee; or (3) any commercial conduit lacking good faith in receipt of such property.

155.     The SFS Transfers as reflected in the attached Exhibit F constitute transfers of an interest in property of the Debtor to SFS Funding within two years (under Section 548 of the Bankruptcy Code) and four years (under Chapter 726 of the Florida Statutes) prior to the Petition Date.

156.     The SFS Transfers were made with actual intent to hinder, delay, or defraud creditors of the Debtor.  Among other badges of fraud at or near the time of the SFS Transfers: (i) Rothstein was utilizing the Debtor to conduct the Ponzi Scheme and (ii) the Debtor was not paying its debts as they became due, (iii) the Debtor was commingling trust funds, funds from operations and investor funds and (iv) the Debtor was transferring funds to Rothstein, or at his direction, for the payment of personal expenses for which the Debtor received no benefit.

157.     As a result of the above, the Trustee can avoid the SFS Transfers pursuant to Sections 544 and 548 of the Bankruptcy Code and Chapter 726 of the Florida Statutes, and recover the value thereof for the benefit of the estate pursuant to Section 550 of the Bankruptcy Code.

WHEREFORE, the Trustee respectfully requests this Court to enter judgment against the Defendant, SFS CAPITAL FUNDING, LLC, that: (i) avoids the SFS Transfers to SFS Funding as reflected in the attached Exhibit F and recovers same for the benefit of the estate; (ii) awards to the Trustee the amount or value of the SFS Transfers, plus pre-judgment and post-judgment interest and costs; (iii) disallows any claim that SFS Funding may have against the Debtor; and (iv) awards any other relief the Court deems appropriate.

**COUNT XXII**
**Action to Avoid and Recover 90 Day Preferential Transfers**
**Pursuant to 11 U.S.C. § 547**
**(Against Defendant SFS Capital Funding, LLC)**

The Trustee sues Defendant SFS Capital Funding, LLC and alleges:

158.     The Trustee repeats and realleges Count XXI of his Complaint as if fully set forth herein.

159.     Pursuant to 11 U.S.C. § 550, in a preferential transfer action commenced under Section 547 of the Bankruptcy Code, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from – (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; (2) any immediate or mediate transferee of such initial transferee; or (3) any commercial conduit lacking good faith in receipt of such property.

160.     The 90 Day SFS Preferential Transfers constituted transfers of property of the Debtor made within 90 days of the Petition Date: (i) to or for the benefit of SFS Funding, which, at all relevant times, was a creditor of the Debtor; (ii) for or on account of an antecedent debt owed by the Debtor to SFS Funding before such transfers were made; and (iii) while the Debtor was insolvent.

161.     The 90 Day SFS Preferential Transfers enabled SFS Funding to receive more than it would have received if: (i) this case were a case under Chapter 7 of the Bankruptcy Code; (ii) the 90 Day SFS Preferential Transfers had not been made; and (iii) SFS Funding received payment of its debt to the extent provided by the Bankruptcy Code.

162.     By reason of the foregoing, the 90 Day SFS Preferential Transfers are avoidable pursuant to 11 U.S.C. § 547(b).  As a result, The Trustee may recover the amount or value of the

90 Day SFS Preferential Transfers from SFS Funding pursuant to 11 U.S.C. § 550.

WHEREFORE, the Trustee respectfully requests this Court to enter a judgment against the Defendant, SFS CAPITAL FUNDING, LLC, that: (i) avoids the 90 Day SFS Preferential Transfers to SFS Funding in the amounts reflected in the attached Exhibit F, pursuant to 11 U.S.C. § 547(b); (ii) awards to the Trustee pursuant to Section 550 of the Bankruptcy Code the amount or value of the 90 Day SFS Preferential Transfers reflected in the attached Exhibit F, plus pre-judgment and post-judgment interest and costs; (iii) disallows any claim that SFS Funding may have against the Debtor; and (iv) awards any relief the Court deems appropriate.

## COUNT XXIII
### Action for Turnover of Property of the Estate
### and Demand for an Accounting Pursuant to 11 U.S.C. § 542
### (Against Defendant SFS Capital Funding, LLC)

The Trustee sues Defendants SFS Capital Funding, LLC and alleges:

163.     The Trustee repeats and realleges Count XXI of his Complaint as if fully set forth herein.

164.     This is an action for turnover of property of the estate pursuant to Section 542 of the Bankruptcy Code and a demand for an accounting in accordance therewith.

165.     The SFS Transfers constitute property of the estate to be recovered and administered by the Trustee pursuant to Section 541 of the Bankruptcy Code.

166.     As a result of the foregoing, pursuant to Section 542 of the Bankruptcy Code, the Trustee is entitled to the immediate payment and turnover from SFS Funding of any and all transfers made by the Debtor, directly or indirectly, to SFS Funding.

167.     The Trustee is also entitled to an accounting of all transfers received by the SFS Funding, directly or indirectly, from the Debtor.

WHEREFORE, the Trustee respectfully requests this Court to enter judgment, jointly and severally, against the Defendant**s,** SFS CAPITAL FUNDING, LLC: (i) ordering SFS Funding to turnover to the Trustee all funds and other things of value that are the subject of the SFS Transfers that are the subject of Count XXI above; (ii) ordering SFS Funding to account to the Trustee regarding the status, use and current location of such funds and assets; (iii) entering a judgment for the value of the assets that comprise such funds and other things of value, including pre-judgment and post-judgment interest and costs; and (iv) for any other relief the Court deems appropriate.

## COUNT XXIV
### Action for Constructive Trust
#### (Against Defendants SFS Capital Funding, LLC)

The Trustee sues Defendants SFS Capital Funding, LLC and alleges:

168.     The Trustee repeats and realleges Count XXI his Complaint as if fully set forth herein.

169.     The Trustee is the legal title holder to all property of RRA.

170.     The SFS Transfers were effected by RRA fraudulently or alternatively, without fraud but retained by SFS Funding under inequitable circumstances.

171.     As the beneficiary of the SFS Transfers, SFS Funding knew or should have known that the SFS Transfers were improper.

172.     SFS Funding has been unjustly enriched to the detriment of RRA, and as a result, a constructive trust should be established against the SFS Transfers and all proceeds of the SFS Transfers.

WHEREFORE, the Trustee respectfully requests this Court to enter a judgment against the Defendant, SFS CAPITAL FUNDING, LLC, for imposition of a constructive trust lien to be

established against the SFS Transfers and all proceeds of the SFS Transfers, for damages and all such other relief as this court deems just and appropriate.

## COUNT XXV
### Action for Equitable Lien
### (Against Defendants SFS Capital Funding, LLC)

The Trustee sues Defendants SFS Capital Funding, LLC and alleges:

173.     The Trustee repeats and realleges Count XXI of his Complaint as if fully set forth herein.

174.     The Trustee is the legal title holder to all property of RRA.

175.     The SFS Transfers were effected by RRA fraudulently or egregiously, or alternatively, without fraud but retained by SFS Funding under inequitable circumstances.

176.     As the beneficiary of the SFS Transfers, SFS Funding knew or should have known that the SFS Transfers were improper.

177.     SFS Funding has been unjustly enriched to the detriment of RRA, and as a result, an equitable lien should be established against all realty and personalty acquired by SFS Funding directly traceable to the SFS Transfers and all proceeds of the SFS Transfers.

WHEREFORE, the Trustee respectfully requests this Court to enter a judgment, jointly and severally, against the Defendant, SFS CAPITAL FUNDING, LLC, for imposition of an equitable lien to be established against all realty and personalty directly traceable from the SFS Transfers and all proceeds of the SFS Transfers, for damages and all such other relief as this court deems just and appropriate.

## RESERVATION OF RIGHTS

The Trustee reserves his right to amend this Complaint, upon completion of his investigation and discovery, to assert any additional claims for relief against the Defendants as may be warranted under the circumstances allowed by law.

Respectfully submitted this 29th day of August, 2011.

WE HEREBY CERTIFY that we are admitted to the Bar of the U.S. District Court for the Southern District of Florida and that we are in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

GENOVESE JOBLOVE & BATTISTA, P.A.
Special Counsel to the Chapter 11 Trustee
100 S.E. 2nd Street, Suite 4400
Miami, Florida 33131
Telephone: (305) 349-2300
Telecopier: (305) 349-2310

By:/s/  John H. Genovese
        John H. Genovese, Esq.
        Florida Bar No. 280852
        David C. Cimo, Esq.
        Florida Bar No. 775400
        Robert F. Elgidely, Esq.
        Florida Bar No. 111856
        Jesus M. Suarez, Esq.
        Fla. Bar No. 60086

# EXHIBIT
# "A"

**Rothstein Rosenfeldt Adler**
**United States Bankruptcy Court**
**Southern District of Florida**
**Ft Lauderdale Division**
**Case No. 09-34791-BKC-RBR**

**Flow of Funds Analysis - Regent Capital Partners, LLC**

| Entity Name | Issue Date | Clear Date | Receiving Account | Sending Account | Outflows |
|---|---|---|---|---|---|
| Regent Capital Partners,LLC | 01/07/09 | 01/07/09 | Signature Bank #8438 | TD Bank #5344 | 3,555,555.67 |
| Regent Capital Partners,LLC | 01/08/09 | 01/08/09 | Signature Bank #8438 | TD Bank #5344 | 111,111.00 |
| Regent Capital Partners,LLC | 02/09/09 | 02/09/09 | Signature Bank #8438 | TD Bank #5344 | 3,666,666.67 |
| Regent Capital Partners,LLC | 03/09/09 | 03/09/09 | Signature Bank #8438 | TD Bank #5344 | 3,666,666.67 |
| Regent Capital Partners,LLC | 04/13/09 | 04/13/09 | Signature Bank #8438 | TD Bank #5344 | 3,666,666.67 |
| Regent Capital Partners,LLC | 05/07/09 | 05/07/09 | Signature Bank #8438 | TD Bank #5344 | 3,666,666.67 |
| **Regent Capital Partners,LLC** | | | | | **18,333,333.35** |

# EXHIBIT "B"

**Rothstein Rosenfeldt Adler**
**United States Bankruptcy Court**
**Southern District of Florida**
**Ft Lauderdale Division**
**Case No. 09-34791-BKC-RBR**

**Flow of Funds Analysis - Regent Capital Partners, LLC**

| Entity Name | Issue Date | Clear Date | Receiving Account | Sending Account | Outflows |
|---|---|---|---|---|---|
| Murray Huberfeld | 01/12/09 | 01/14/09 | Valley Natl Bank | Signature Bank #8438 | 1,210,000.00 |
| Laura Huberfeld | 02/10/09 | 02/12/09 | Illegible #9769 | Signature Bank #8438 | 1,222,222.00 |
| Laura Huberfeld | 03/10/09 | 03/11/09 | Illegible | Signature Bank #8438 | 1,222,222.00 |
| Laura Huberfeld | 04/07/09 | 04/14/09 | Valley Natl Bank #4746 | Signature Bank #8438 | 1,833,333.00 |
| Laura Huberfeld | 05/07/09 | 05/12/09 | Valley Natl Bank #4746 | Signature Bank #8438 | 916,666.50 |
| Laura Huberfeld | 10/15/09 | 10/22/09 | Valley Natl Bank #4746 | Signature Bank #8438 | 16,500.00 |
| **Huberfeld Total** | | | | | **6,420,943.50** |

# EXHIBIT
# "C"

**Rothstein Rosenfeldt Adler**
**United States Bankruptcy Court**
**Southern District of Florida**
**Ft Lauderdale Division**
**Case No. 09-34791-BKC-RBR**

**Flow of Funds Analysis - Regent Capital Partners, LLC**

| Entity Name | Issue Date | Clear Date | Receiving Account | Sending Account | Outflows |
|---|---|---|---|---|---|
| Dalia Kalter | 01/12/09 | 01/16/09 | 21229230 | Signature Bank #8438 | 541,334.00 |
| Dalia Kalter | 02/09/09 | 02/20/09 | 21229230 | Signature Bank #8438 | 1,222,222.00 |
| Dalia Kalter | 03/15/09 | 03/19/09 | Illegible | Signature Bank #8438 | 1,222,222.00 |
| **Kalter Total** | | | | | **2,985,778.00** |

# EXHIBIT "D"

**Rothstein Rosenfeldt Adler**
**United States Bankruptcy Court**
**Southern District of Florida**
**Ft Lauderdale Division**
**Case No. 09-34791-BKC-RBR**

**Flow of Funds Analysis - Regent Capital Partners, LLC**

| Entity Name | Issue Date | Clear Date | Receiving Account | Sending Account | Outflows |
|---|---|---|---|---|---|
| David Bodner | 01/12/09 | 01/15/09 | Valley Natl Bank | Signature Bank #8438 | 1,210,000.00 |
| Naomi Bodner | 02/12/09 | 02/19/09 | Illegible  #4895 | Signature Bank #8438 | 1,222,222.00 |
| Naomi Bodner | 03/12/09 | 03/16/09 | Illegible | Signature Bank #8438 | 1,222,222.00 |
| Naomi Bodner | 04/07/09 | 04/14/09 | Valley Natl Bank #4050 | Signature Bank #8438 | 1,833,333.00 |
| Naomi Bodner | 05/07/09 | 05/14/09 | Valley Natl Bank #4050 | Signature Bank #8438 | 916,666.50 |
| Naomi Bodner | 10/15/09 | 10/22/09 | Valley Natl Bank #4050 | Signature Bank #8438 | 16,500.00 |
| **Bodner Total** | | | | | **6,420,943.50** |

# EXHIBIT
# "E"

**Rothstein Rosenfeldt Adler**
**United States Bankruptcy Court**
**Southern District of Florida**
**Ft Lauderdale Division**
**Case No. 09-34791-BKC-RBR**

**Flow of Funds Analysis - Regent Capital Partners, LLC**

| Entity Name | Issue Date | Clear Date | Receiving Account | Sending Account | Outflows |
|---|---|---|---|---|---|
| Bodner Family Foundation | 01/12/09 | 01/14/09 | Valley National Bank | Signature Bank 8438 | 668,666.00 |
| **Bodner Family Foundation Total** | | | | | **668,666.00** |

# EXHIBIT
## "F"

**Rothstein Rosenfeldt Adler**
**United States Bankruptcy Court**
**Southern District of Florida**
**Ft Lauderdale Division**
**Case No. 09-34791-BKC-RBR**

**Flow of Funds Analysis - Regent Capital Partners, LLC**

| Entity Name | Issue Date | Clear Date | Receiving Account | Sending Account | Outflows |
|---|---|---|---|---|---|
| SFS Funding, LLC | 05/08/09 | 05/08/09 | Wachovia Bank #4604 | Signature Bank #8438 | 1,833,333.00 |
| SFS Funding, LLC | 06/11/09 | 06/11/09 | Wachovia Bank #4604 | TD Bank #5344 | 1,400,000.00 |
| SFS Funding, LLC | 08/05/09 | 08/06/09 | Wachovia Bank #4604 | TD Bank #5344 | 750,000.00 |
| SFS Funding, LLC | 08/12/09 | 08/12/09 | Wachovia Bank #4604 | TD Bank #5344 | 600,000.00 |
| SFS Funding, LLC Total | | | | | 4,583,333.00 |

| 90-Day Preference Payment | 600,000.00 |
|---|---|

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION
### www.flsb.uscourts.gov

In re:                                                          Chapter 11

ROTHSTEIN ROSENFELDT ADLER, P.A.,                Case No. 09-34791-BKC-RBR

    Debtor.

_____/

HERBERT STETTIN, Trustee,

    Plaintiff,                                      Adv. Case No. 11-02473-RBR

                   v.

REGENT CAPITAL PARTNERS, LLC, a New York
limited liability company, LAURA HUBERFELD and
MURRAY HUBERFELD, husband and wife, NAOMI
BODNER and DAVID BODNER, husband and wife,
the BODNER FAMILY FOUNDATIONS, a New
York Corporation,  DAHLIA KALTER and MARK
NORDLICHT, husband and wife, and SFS CAPITAL
FUNDING, LLC, a Nevada limited liability company,

    Defendants.

_____/

## DEFENDANTS' DEMAND FOR JURY TRIAL

       Defendants Regent Capital Partners, LLC, Laura Huberfeld, Murray Huberfeld, Naomi

Bodner, David Bodner, the Bodner Family Foundation, Inc., Dahlia Kalter, and Mark Nordlicht,

by their undersigned counsel, and pursuant to Rule 38(b) of the Federal Rules of Civil Procedure

and Rule 9015 of the Federal Rules of Bankruptcy Procedure, hereby demand a jury trial of all

issues so triable in this matter.

*[Remainder of Page Intentionally Left Blank]*

Case No. 11-02473-RBR

Dated: November 3, 2011                    Respectfully submitted,

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida and that I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

**SHUTTS & BOWEN LLP**
1500 Miami Center
201 South Biscayne Boulevard
Miami, FL  33131
Phone:  305-358-6300
Facsimile:  305-347-7802
*Attorneys for Defendants*

/s/ *Robert Fracasso*
Robert Fracasso, Esq.
Florida Bar No. 959928
rfracasso@shutts.com

Steven M. Ebner, Esq.
Florida Bar No. 634727
sebner@shutts.com

Harris J. Koroglu, Esq.
Florida Bar No. 32597
hkoroglu@shutts.com

-2-

Case No. 11-02473-RBR

**<u>CERTIFICATE OF SERVICE</u>**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on all

parties listed below via ECF or first class U.S. Mail on this 3rd day of November 2011.

/s/ *Robert Fracasso*
Robert Fracasso

## Electronic Mail Notice List

The following is the list of **<u>parties</u>** who are currently on the list to receive e-mail notice/service
for this case.

- David C. Cimo    dcimo@gjb-law.com
- John D Eaton    jeaton@rascoklock.com,
  ogonzalez@rascoklock.com;nsingh@rascoklock.com
- Robert G Fracasso Jr    rfracasso@shutts.com
- John H Genovese    jgenovese@gjb-law.com, dsanchez@gjb-law.com;gjbecf@gjb-law.com
- John C. Shawde    jshawde@rascoklock.com,
  ogonzalez@rascoklock.com;nsingh@rascoklock.com

5764502_4.DOC

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(FORT LAUDERDALE DIVISION)
www.flsb.uscourts.gov

CASE NO. 09-34791-BKC-RBR
In re                                                CHAPTER 11

ROTHSTEIN ROSENFELDT ADLER, P.A.,

      Debtor.

_____/

HERBERT STETTIN, not individually but                ADV. NO. 11-02473-BKC-RBR-A
as Chapter 11 Trustee of the estate of the
Debtor, Rothstein Rosenfeldt Adler, P.A.,

      Plaintiff,

v.

REGENT CAPITAL PARTNERS, LLC,
a New York limited liability company,
LAURA HUBERFELD and MURRAY HUBERFELD,
husband and wife, NAOMI BODNER and
DAVID BODNER, husband and wife,
the BODNER FAMILY FOUNDATIONS,
a New York Corporation, DAHLIA KALTER and
MARK NORDLICHT, husband and wife, and
SFS CAPITAL FUNDING, LLC, a Nevada
limited liability company,

      Defendants.

_____/

## MOTION OF PLAINTFF, CHAPTER 11 TRUSTEE HERBERT STETTIN, FOR PRELIMINARY INJUNCTION AND OTHER RELIEF

## AND

## REQUEST FOR JUDICIAL NOTICE

The Plaintiff, Herbert Stettin (the "Trustee" or "Stettin"), not individually but as Chapter

11 Trustee of the bankruptcy estate of Rothstein Rosenfeldt Adler, P.A. (the "Debtor" or

"RRA"), files this Motion for Preliminary Injunction and Other Relief against Defendants

against Regent Capital Partners, LLC, a New York limited liability company ("Regent"), Laura Huberfeld, Murray Huberfeld, Naomi Bodner, David Bodner, the Bodner Family Foundation, Dahlia Kalter Nordlicht, Mark Nordlicht and SFS Capital Funding, LLC (collectively, the "Defendants"), pursuant to Section 105(a) of Title 11 of the United States Code (the "Bankruptcy Code"), Rule 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Section 726.108(1)(c)(1) of the Florida Statutes, and Request for Judicial Notice pursuant to Rule 201(b) of the Federal Rules of Evidence, and says:

## INTRODUCTION

By this Motion, the Trustee seeks the entry of a preliminary injunction against the Defendants, whom collectively received over $18 million of avoidable transfers within two years of the entry of the Debtor's November 25, 2009 order for relief (hereinafter, the "Petition Date"). For the reasons set forth herein, the relief requested is necessary and appropriate to carry out the Trustee's avoidance power of Chapter 5 of the Bankruptcy Code.

As is now well known, Scott W. Rothstein ("Rothstein") pleaded guilty to the perpetration of a massive Ponzi scheme and has been sentenced to 50 years imprisonment for his crimes. Rothstein utilized the Debtor to secure capital from investors for the stated purpose of making discounted lump-sum payments to the Debtor's putative clients who had purportedly settled pre-suit, confidential settlements with putative defendants in exchange for assignments of the full settlement proceeds, which had purportedly been deposited, and were being maintained, in the Debtor's financial institution accounts (the "Confidential Settlements"). Significantly, however, Rothstein completely fabricated the existence of the Debtor's putative clients, the putative defendants, the claims, the settlements, and the settlement proceeds (the "Ponzi Scheme"). The Debtor's receipt and disbursement of funds obtained in furtherance of the Ponzi Scheme, at Rothstein's direction, constitutes irrefutable evidence of its actual intent to hinder,

2

delay or defraud creditors, and such intent has been established as a matter of law by Rothstein's guilty pleas and sentencing.

Defendants Murray Huberfeld, Mark Nordlicht and David Bodner are the principals, control persons and/or insiders of three affiliated hedge funds that collectively received in excess of $420 million in transfers from the Debtor.  The hedge funds solicit domestic and/or foreign investors to make investments in the funds and acquire, sell, re-position, and/or liquidate the funds' investment portfolios on a frequent basis.  Over a period of one year, the hedge funds channeled their investors' funds to the Debtor for the specific purpose of funding  of Confidential Settlements and profiting on spectacular returns consisting of interest and the significant yield between the lump-sum payments and the full settlement proceeds (i.e., 125% to 600%).

On or about December 2008, as the hedge funds were openly questioning their investment in Rothstien's Ponzi scheme, the Defendants engaged in a side-deal engineered to enable them to participate in a one-time investment that would enable Regent to purchase a purported Confidential Settlement for $11,000,000.00 and be repaid $22,000,000.00 within six months (the "Regent Side Deal").  The Regent Side-Deal bore an annual rate of interest of over 437.1%.

By April 7, 2009, Defendants Murray Huberfeld, Mark Nordlicht and David Bodner were all aware that Rothstein had defaulted and that the Confidential Settlements were a total sham. Indeed, even though Rothstein did not make payments due under prior settlements by creating the ruse that the Florida Bar had frozen all of RRA's trust accounts, the Regent Side-Deal continued to receive scheduled monthly payments as required under the deal documents.  From this date forward, Regent received at least, an additional $7,333,333.35 which it promptly disbursed for the benefit of the Defendants.

3

Defendants Murray Huberfeld and David Bodner's willingness to invest in a fraud should come as no surprise.  Indeed, Murray Huberfeld who, upon information and belief, was the individual "pulling the strings" respecting the Funds' involvement in the Rothstein Ponzi, had been involved in SEC investigations involving alleged "pump and dump" scams.  In fact, Murray Huberfeld together with David Bodner and their New York investment firm, Broad Capital, collectively disgorged approximately $4.7 million as a result of the collapse of INCONNECT.

On August 29, 2011, the Trustee filed his Adversary Complaint against the Defendants seeking, *inter alia,* to avoid and to recover fraudulent transfers, for turnover of property of the estate, for constructive trust, for an equitable lien, and for an accounting.[1]  The Trustee believes that the Defendants may disburse the transfers beyond the jurisdiction of the United States, or that the Defendants will otherwise dissipate, deplete or conceal the transfers during the pendency of this action.

Upon information and belief, Defendants Murray Huberfeld, David Bodner and Mark Nordlicht are sophisticated investors with the knowledge and ability to dissipate funds and place them beyond the jurisdiction of this Court.  In order to maintain the *status quo* and to preserve this Court's ability to award appropriate relief to the Debtor's bankruptcy estate, the Trustee seeks the issuance of a preliminary injunction following a hearing, restraining and enjoining the Defendants, their third party counterparties or creditors, their attorneys, agents, employees, and all those who act in concert or participation with any of the foregoing from directly or indirectly disbursing, dissipating, disposing of, depleting, concealing, transferring, conveying, selling, assigning, pledging, hypothecating, and/or encumbering the transfers received from the Debtor

---

[1] The allegations of and exhibits to the Adversary Complaint are incorporated by reference as if fully set forth herein.  Pursuant to Fed. R. Evid. 201, the Trustee requests that the Court take judicial notice of pleadings before the Court.  *See Cash Inn of Dade, Inc. v. Metro-Dade County*, 938 F. 2d 1239, 1243 (11th Cir. 1991)(court may take judicial notice of public records within its files relating to the particular case).

(or the proceeds, products or replacements thereof).   This Court has the power to issue a preliminary injunction requested pursuant to Bankruptcy Code Section 105(a), Bankruptcy Rule 7065, and Section 726.108(1)(c)(1) of the Florida Statutes. Such relief is necessary and appropriate in this case to carry out the provisions of the Bankruptcy Code's fraudulent transfer, preferential transfer, property of the estate and turnover provisions.   Otherwise, the Trustee's suit will be an exercise in futility.

<u>F</u>ACTS <u>S</u>UPPORTING THE <u>R</u>ELIEF <u>R</u>EQUESTED

**A.      The Scott W. Rothstein Criminal Plea**

1.      On December 1, 2009, Scott W. Rothstein was charged by way of Information, and arrested on charges, of: *Count 1:* engaging in a racketeering conspiracy; *Count 2:* money laundering conspiracy; *Count 3:* mail and wire fraud conspiracy; and *Counts 4 and 5:* committing acts of wire fraud (from in or about 2005 through in or about November 2009).[2]  *See United States of America v. Scott W. Rothstein*, United States District Court for the Southern District of Florida, Case Number 0:09-cr-60331-JIC [D.E. 1] (hereinafter the "Criminal Proceeding").[3]

2.      According to the Information, Rothstein committed the specified criminal acts in

---

[2] The Information also sought criminal forfeiture of cash in the amount of $1,200,000, 24 real properties, 24 vehicles/vessels, and 9 items of tangible property, 15 bank accounts, numerous business interests, and several contributions (the "Forfeited Assets").

[3] The Trustee respectfully requests the Court take judicial notice of the Information, Protective Order, Plea Agreement, and transcript of the Sentencing Hearing in the Criminal Proceeding [D.E. 1, 12, 13, 69, 290, and 334].  Fed. R. Ev. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.")  *See, e.g., Universal Foam v. Kohr* (*In re Kohr*), 399 B.R. 284, 287 (Bankr. M.D. Fla. 2008) (Court may take judicial notice of the docket and documents filed in litigation related to the debtor) and *In re Loe*, No. 07-12045-BKC-RBR, 2007 WL 997581, at * 1 (Bankr. S.D. Fla. Mar. 29, 2007) ("a bankruptcy judge may take judicial notice of the records on file before the court, as well as the relevant records of other courts both within and outside of the federal system").

order to unlawfully obtain approximately $1,200,000,000.00 ($1.2 Billion) from investors by fraud in connection with an investment scheme commonly known as a "Ponzi scheme" (in which new investors' funds are utilized to pay previous investors in the absence of any underlying security, legitimate investment vehicle or other commodity).

3.     On December 7, 2009, the District Court issued a Protective Order in order "to prevent the transfer, alienation encumbrance or dissipation of the [Forfeited Assets] by the defendant or any third party which would render said property unavailable for forfeiture. *See* Criminal Proceeding, D.E. 12 and 13.

4.     On or about January 26, 2010, the Government and Rothstein entered into a Stipulation and Settlement whereby Rothstein agreed to forfeiture of the assets identified in the Information. *Id*. at D.E. 66-1.

5.     On January 27, 2010, Rothstein changed his plea and pleaded guilty to all counts of the Information. *Id*. at D.E. 67. As set forth in the Plea Agreement, Rothstein conspired with others to use RRA as a criminal enterprise in order to conduct a pattern of racketeering activity resulting in violations of mail fraud, wire fraud, money laundering and conspiracy statutes from in or about 2005 through in or about November 2009. *Id*. at D.E. 69.

6.     Rothstein's crimes primarily involved the solicitation of investments in and the sale of fraudulent and fictitious discounted settlements purportedly between certain of the Debtor's clients and third parties.

7.     Specifically, Rothstein represented to prospective investors that: (i) certain of RRA's clients had settled sexual harassment and whistleblower claims against third party/putative defendants prior to the commencement of litigation; (ii) the third party/putative defendants had paid the settlement proceeds into RRA's financial institution accounts; and (iii) the settlements provided for disbursement of the proceeds to RRA's clients over an extended

period of time, subject to strict confidentiality provisions prohibiting the disclosure of the identities of the parties.

8.  Rothstein further represented to prospective investors that they could "purchase" by assignments these streams of settlement proceeds disbursed from RRA's financial institution accounts from certain of RRA's clients in exchange for substantially discounted lump-sump payments, thereby profiting on the yield between the lump-sum payment and the total settlement proceeds.  The yield was enormous, at times as much as 600%, and clearly a red flag sounding a tocsin that these deals were "too good to be true."

9.  Rothstein provided prospective investors with a package of documents, including a copy of a redacted contingency fee agreement between RRA and RRA's purported client, a copy of a redacted settlement agreement between RRA's purported client and the third party/putative defendant, a sale and transfer agreement, an acknowledgement of assignment/purchase of settlement proceeds agreement, a guaranty executed by Rothstein personally and on behalf of RRA, a retainer agreement, a copy of a redacted wire transfer confirmation purporting to evidence payment of the settlement proceeds into RRA's financial institution account, and correspondence detailing the transaction on RRA's letterhead (collectively referred to herein as the "Confidential Settlement Documents").

10.  In truth, Rothstein, in furtherance of his massive Ponzi Scheme, falsified the existence of the clients, falsified the existence of the defendants, falsified the existence of the settlements, falsified the existence of the settlement proceeds, falsified the Confidential Settlement Documents, looted RRA and utilized investor funds and RRA client funds to repay earlier investors and for lavish personal expenditures.  RRA, at Rothstein's direction, and at all times, exercised dominion and control of all of the transferred funds at issue in this case.

11.     On June 9, 2010, Rothstein was sentenced to fifty years imprisonment for his

crimes.  *Id*. at D.E. 290.  At the sentencing hearing, District Judge James I. Cohn described

Rothstein's Ponzi Scheme as follows:

> In its simplest form, this case is about the selling of fake financial products.  The
> marketing, however, was anything but simple.  It was sophisticated rivaling that
> of Madison Avenue's advertising elite.  It was all about image, wealth, power,
> and influence, WPI.  The marketing component of the fraud focused on attracting
> investors with deep pockets.  Mr. Rothstein displayed all of the trappings of
> success, the multi million dollar homes, the expensive cars, the boats, the
> restaurants, the jewelry, and a 70-lawyer law firm that appeared to be thriving.
>
> . . .
>
> Mr. Rothstein created the fraudulent court orders in order to perpetuate the
> fraudulent scheme. These actions constitute the most egregious wrongs a licensed
> attorney can commit and represent a total disrespect for the authority and dignity
> of the courts.  There can be no conduct more reviled than an attorney perpetrating
> such a fraud on the Court.

*Id*. at D.E. 334, pp. 56-59.

**B.     The Funds Join the Show**

12.     In or about early 2008, Rothstein was soliciting buyers for the sale of the

Confidential Settlements from largely unregulated hedge funds and "fund of funds," or so-called

"feeder funds."  He utilized a number of entities under the "Banyon" umbrella (believed to be

seven), including Banyon Funding, LLC, Banyon Investments, LLC, and Banyon Resources,

LLC (collectively, the "Banyon Funding Entities") as the vehicle to solicit purchases of the

Confidential Settlements.  The Banyon funds are owned and controlled by George Levin.  Frank

Preve was the person responsible for managing Banyon's investments in the purported

Confidential Settlements.

13.     After borrowing the money from the Funds, Banyon, in turn, purchased a

substantial number of the Confidential Settlements.  The Funds agreed to lend Banyon over $250

million dollars' worth of revolving loans for the purpose of Banyon acquiring settlement

proceeds.  In total, the Funds advanced approximately $441 million, in aggregate on a revolving basis, to RRA through the Banyon Funding Entities to purchase settlement proceeds.  Ultimately, the Funds received repayments from RRA, through the Banyon Funding Entities, of approximately $420 million.

14.    The Funds were sophisticated investors who purported to conduct their own diligence of RRA and the Confidential Settlements both before and during the period in question. Their investigation revealed a significant number of red flags with Rothstein's Confidential Settlement business, facts which would have been apparent to any reasonable investor, indicating that Rothstein was involved in a fraud.

15.    As an example, in or about June 2008, Defendants obtained an investigative report from Kroll Associates, Inc. ("Kroll"), respecting **"certain individuals and business entities" involved in Rothstein's Confidential Settlement scheme.  Kroll investigated and reported that it had "[i]nterviewed several sources in the past few weeks. All sources deemed knowledgeable of local litigation believed that Rothstein's firm could not have amassed settlements totaling in the $50 to $100 million range."**  (emphasis added).

16.    Despite Kroll's report that there was no evidence of RRA having generated such settlements, the Funds went forward, apparently blinded to experience and reason by the incredible returns paid on their investments.

17.    In aggregate, over a period of approximately one year (but in the case of Level 3, mere months), the Funds channeled their investors' funds to the Debtor for the specific purpose of funding discounted lump-sum payments to the Debtor's putative clients and profiting on spectacular returns derived from unbelievable rates of interest and equity returns when the purported full settlement proceeds were released.

18.     The Funds' aggregate outstanding investment peaked on January 2, 2009; at which point they had advanced $344 million and received repayment of $161 million, representing a maximum aggregate exposure of $183 million.  From this point forward, the Funds gradually reduced their exposure in the Rothstein Ponzi.

19.     By December 2008, the Funds were openly questioning their investment in the Rothstein Ponzi Scheme.  Indeed, on December 14, 2008, Jack Simony wrote Murray Huberfeld to express concern "[w]ith back to back articles in the news between Peters [sic], Drier, and now Madoff one would have to be a crazy person not to have his confidence shaken in just about anything short of a T-Bill."

**C.     The Regent Side-Deal**

20.     The Regent Side-Deal was a one-time investment in the Ponzi scheme engineered by Preve as a means to give Regent the ability to purchase a purported Confidential Settlement for $11,000,000.00 and be repaid $22,000,000.00 within six months.  The Regent Side-Deal bore an annual rate of interest of over 437.1%.

21.     As a result of their management and involvement with the Funds, Defendants Murray Huberfeld, Mark Nordlicht, and David Bodner had knowledge of the Funds' due diligence and investment strategy.  In December 2009, they knew the Funds had grown uncomfortable with their exposure in the Rothstein Ponzi Scheme and were planning how to withdraw the Funds from the scheme.  Nonetheless, ignoring their fiduciary duties to the Funds which they controlled and operated, the Regent Side-Deal was concocted to facilitate the Funds' safe exit while at the same time paying Regent a ridiculously high rate of return as compensation for the risks associated with keeping the Ponzi alive to provide the Funds with a safe exit, and enriching the Funds' principals at the expense of the Funds and later investors in the Ponzi Scheme.

22.     While the Funds were withdrawing from the Ponzi scheme by manipulating their funding to finance smaller settlements so that the repayment stream from prior settlements drastically exceeded the amounts funded on "new deals," the Regent Side-Deal was conceived. In addition, the cash-infusion provided by the Regent Side-Deal allowed Rothstein to attempt to find new investors to enable him to pay back the Funds.

23.     On December 2, 2008, the first evidence of the Regent Side-Deal appears in an e-mail, subject line: Regent Capital Partners, to Scott Rothstein from Frank Preve.  Preve's e-mail was sent using his alias e-mail account (gsteinbach@sfsfunding.com) associated with SFS Funding, which is an entity Preve formed to receive commissions on side deals.

24.     Simultaneous with Simony's reconsideration of the need for further diligence because of the Madoff, Petters and Drier Ponzi schemes, among others, the Regent Side-Deal was set in motion.   Through their wives, Murray Huberfeld, Mark Nordlicht and David Bodner directed the formation of Regent for the sole purpose of side-deal.  The Regent Side Deal was extraordinary, vastly exceeding the return on investment obtained by the Funds on any prior settlement, providing for Regent to advance $11,000,000.00 in exchange for repayment of $22,000,000.00 over six months.

25.     In addition to their knowledge that they were engaged in an improper transaction with respect to their fiduciary obligations to the Funds' investors, the Defendants knew that Preve was breaching his fiduciary obligations to Banyon by orchestrating the Regent Side-Deal. Significantly, although the Regent Side-Deal was papered on December 2, 2008, Regent did not actually fund the deal until January 2, 2009, just days prior to receiving the first scheduled return payment which was made January 7, 2009.  Further, despite the assertion that RRA's trust accounts had been frozen by the Florida Bar accounting for a suspension of payment to the Funds, payments made pursuant to the Regent Side-Deal strangely continued.

11

26.     Defendant SFS Funding, an entity controlled by Preve, received $2,750,000 directly from RRA and $1,833,333 from Regent.

**D.     The Transfers at Issue**

27.     In the two year period prior to the Petition Date, the Defendants (all "net winners") received transfers from the Debtor (the "Fraudulent Transfers"), which were disbursed as follows:

a.  $18,333,333.35  to Regent Capital from January 7, 2009 through May 7, 2009 (the "Regent Transfers");

b.  $6,420,943.50 of the Regent Transfers which were subsequently transferred to Murray Huberfeld and Laura Huberfeld for the benefit of the Huberfelds between January 12, 2009 and October 22, 2009;

c.  $2,985,778.00 of the Regent Transfers which were subsequently transferred to Dahlia Kalter for the benefit of the Nordlichts between January 12, 2009 and March 19, 2009;

d.  $6,420,943.50 of the Regent Transfers which were subsequently transferred to Naomi Bodner for the benefit of the Bodners between January 12, 2009 and October 22, 2009;

e.  $668,666.00 of the Regent Transfers which were subsequently transferred to the Bodner Family Foundation for the benefit of the Bodners on January 14, 2009; and

f.  On May 8, 2009, Regent transferred $1,833,333 of the Regent Transfers to SFS Funding and the Debtor separately transferred to SFS Funding $1,400,000 on June 11, 2009, $750,000 on August 5, 2009, and $600,000 on August 12, 2011.

**D.      The Bankruptcy Case**

28.      On November 10, 2009, a group of petitioning creditors filed an involuntary petition for reorganization under Chapter 11 of the Bankruptcy Code against the Debtor.

29.      On November 20, 2009, Stettin was appointed and continues to serve as the Chapter 11 Trustee for the Debtor's bankruptcy estate.

30.      On November 25, 2009, RRA consented to the entry of an Order for Relief under Chapter 11 of the Bankruptcy Code.

31.      As the duly appointed and acting Chapter 11 Trustee for the Debtor's bankruptcy estate, Stettin has a fiduciary duty to maximize the pool of assets available for distribution to creditors and to make distributions to creditors in accordance with the priority scheme set forth in the Bankruptcy Code.

<u>LEGAL ARGUMENT & CITATION TO AUTHORITY</u>

**I.      Preliminary injunctive relief is necessary and appropriate in this case.**

Bankruptcy Code Section 105(a) states that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  "It is well-established that the power to issue "any order" under § 105(a) includes the power to enter injunctions that are necessary to carry out the provisions of the Bankruptcy Code."  *Altman v. Davis & Dingle Family Dentistry (In re EZ Pay Services, Inc.)*, 389 B.R. 751, 756 (Bankr. M.D. Fla. 2007) (citations omitted).  However, a party seeking injunctive relief under Bankruptcy Code Section 105(a) must still "satisfy the traditional nonbankruptcy requirements for such relief under Rule 65 of the Federal Rules of Civil Procedure."  *Id.*  (Citations omitted).

"[A] bankruptcy court may grant an applicant's request for a preliminary injunction if the requesting party indicates that: (1) there is a substantial likelihood that the movant will prevail on the merits; (2) the movant will suffer irreparable harm unless the injunction is granted; (3) the

13

threatened injury to the movant outweighs whatever damage the proposed injunction may cause

the opposing party; (4) the injunction, if granted,  would not be adverse to public interest; and (5)

there is no adequate remedy at law.  *Kapila v. Clark (In re Trafford Distributing Center, Inc.)*,

414 B.R. 849, 856 (Bankr. S.D. Fla. 2009) (citations omitted).  Florida law also provides broad

remedies to creditors asserting fraudulent transfer claims against transferees including "[a]n

injunction against further disposition by the debtor or a transferee, or both, of the asset

transferred or of other property."  Fla. Stat. § 726.108(1)(c)(1) and *Friedman v. Heart Institute of*

*Port St. Lucie, Inc.*, 863 So. 2d 189, 191-192 (Fla. 2003).

> **A.**     ***There is a substantial likelihood that the Trustee will prevail on the merits of his fraudulent transfer claims.***

In Counts 1, 5, 9, 13, 17 and 21 of the Adversary Complaint, the Trustee has asserted

claims to avoid and to recover the Fraudulent Transfers from the Debtor to the Defendants

pursuant to, among other provisions, Bankruptcy Code Sections 544, 548(a)(1)(A), and 550 and

Sections 726.105(1)(a) and 726.108 of the Florida Statutes.[4]

> Bankruptcy Code Section 548(a)(1)(A) states as follows:
>
> The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

---

[4] The provisions of Section 726.105(1)(a) of the Florida Statutes are substantially similar to the provisions of Section 548(a)(1)(A) of the Bankruptcy Code.  A non-exhaustive list of the so-called "badges of fraud" evincing actual intent are set forth at Section 726.105(2) of the Florida Statutes and the remedies available to creditors are set forth at Section 726.108 of the Florida Statutes.

It cannot be disputed that the Debtor's transfers to the Defendants constituted "interest[s] of the debtor in property" within the meaning of Bankruptcy Code Section 548(a)(1)(A), as they were transferred from commingled accounts in the name of the Debtor, and were otherwise controlled by the Debtor.  Funds obtained by a debtor, even if obtained in furtherance of a Ponzi scheme, are property of the debtor for the purposes of the fraudulent transfer provisions. *Securities Investor Protection Corp. v. Old Naples Securities, Inc. (In re Old Naples Securities, Inc.)*, 343 B.R. 310, 319 (Bankr. M.D. Fla. 2006) (citations omitted).  It also cannot be disputed that the Fraudulent Transfers were made within two years of the Petition Date.  Finally, it cannot be disputed that the Debtor made the Fraudulent Transfers to the Defendants with the actual intent to hinder, delay or defraud creditors because such transfers were made in furtherance of, and in order to perpetuate and prolong, the Ponzi Scheme.

The Eleventh Circuit has described a "Ponzi scheme" as follows:

[A] pyramid-type investment scheme where investors are paid profits from newly attracted investors promised large returns on their principal investments. Typically, it is not supported by any underlying business venture.  An investor that does receive money is not receiving income on his or her own investment, but merely a return of his or her own principal, or that of another investor.  More and more investors are solicited in order that the investors at the top of the pyramid can be compensated.  Usually the pyramid collapses, the majority of investors never receive any profits, losing their principal investment as well.

*Orlick v. Kozyak (In re Financial Federated Title & Trust, Inc.)*, 309 F.3d 1325, 1327 fn. 2 (11th Cir. 2002).  *Accord*, *Bauman v. Bliese (In re McCarn's Allstate Finance, Inc.)*, 326 B.R. 843, 845 (Bankr. M.D. Fla. 2005) and *Gredd v. Bear, Stearns Securities Corp. (In re Manhattan Inv. Fund, Ltd.)*, 359 B.R. 510, 517 (Bankr. S.D.N.Y. 2007).

Courts nationwide, including this Court, have recognized that establishing the existence of a Ponzi scheme is sufficient to prove a Debtor's actual intent to defraud.  *McCarn's Allstate Finance*, 326 B.R. 850; *Manhattan Inv. Fund*, 359 B.R. at 517; and *Stettin v. Adler*, Case No. 10-

02612-BKC-RBR-A, Order Granting Trustee's Motion For Partial Summary Judgment On Counts I And III [D.E. 148, at pp. 8 and 9].  This is so because a debtor who runs a Ponzi scheme knows that his future investors will lose their money and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them.  *Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Group, LLC)*, 396 B.R. 810, 835 (Bankr. S.D.N.Y. 2008)[5] (citing *McCarn's Allstate Finance*, 326 B.R. at 851; *Rosen v. Neilson (In re Slatkin)*, 310 B.R. 740, 748 (C.D. Cal. 2004), *aff'd*, 222 Fed. Appx. 545 (9th Cir. 2007); *Scholes v. Lehmann*, 56 F.3d 750, 762 (7th Cir. 1995), *cert. denied sub nom African Enterprise, Inc. v. Scholes*, 516 U.S. 1028, 133 L. Ed. 2d 522, 116 S. Ct. 673 (1995); and *Emerson v. Maples (In re Mark Benskin & Co., Inc.)*, 161 B.R. 644, 648-49 (Bankr. W.D. Tenn. 1993)).  This is referred to as a "Ponzi scheme presumption."  *Bear, Stearns Securities Corp. v. Gredd (In re Manhattan Investment Fund, Ltd.)*, 397 B.R. 1, 8 (S.D.N.Y. 2007) (transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors).  Accord, *Old Naples Securities, Inc.*, 343 B.R. at 319-320 (collecting cases adopting the Ponzi scheme presumption).   As one court put it,

> "[o]ne can infer an intent to defraud future undertakers from the mere fact that a debtor was running a Ponzi scheme.  Indeed, no other reasonable inference is possible.  A Ponzi scheme cannot work forever.  The investor pool is a limited resource and will eventually run dry.  The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors.  The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors.  He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money.  Knowledge to a substantial certainty constitutes intent in the eyes of the law.  *cf.* Restatement (Second) of Torts § 8A (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them.

*Merrill v. Abbott (In re Independent Clearing House Co.)*, 77 B.R. 843, 860 (D. Utah 1987).

---

[5] *Aff'd and rev'd in part by, Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC)*, 439 B.R. 284 (S.D.N.Y. 2010).

Since the Debtor's transfers to the Defendants (made directly or through Regent) constitute "interests of the debtor in property," were made within two years prior to the Petition Date, and were made with the actual intent to hinder, delay or defraud creditors, there is a substantial likelihood that the Trustee will prevail on the merits of his fraudulent transfer claims.

**B.    Defendants bear the burden of proving their defenses under Bankruptcy Code Section 548(c).**

At Sections B, C and D of the Adversary Complaint, the Trustee has alleged that the Defendants knew or should have known that the purported confidential discounted settlements were fraudulent and that Rothstein was engaged in the Ponzi Scheme because they were on actual or inquiry notice of several glaring "red flags" associated therewith but, consciously buried their heads in the sand in order to extract significant amounts of capital from the Debtor at the expense of later victims.  If proven, those facts raise serious issues concerning the availability of the "good faith" defense under Bankruptcy Code Section 548(c).  Regardless, the Defendants bear the burden of proving their defenses under Bankruptcy Code Section 548(c).  *Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC)*, 362 B.R. 624, 631 (Bankr. S.D.N.Y. 2007) and *Bayou Accredited Fund,* 396 B.R. at 843-44.

**C.    The Trustee would suffer irreparable harm unless the injunction is granted.**

The Trustee is seeking to recover the Debtor's transfers to the Defendants for the benefit of the Debtor's bankruptcy estate.  If the Defendants are permitted to disburse, dissipate, or deplete the transfers they received from the Debtor (or the proceeds, products or replacements thereof), the Bankruptcy Code's fraudulent and preferential transfer provisions would be undermined and this Court ability to award appropriate relief to the Debtor's bankruptcy estate would be lost.  The dissipation of the finite resources of an insolvent estate has been found to constitute irreparable injury.  *In re Netia Holdings S.A.*, 278 B.R. 344, 352 (Bankr. S.D.N.Y.

2002) (citations omitted).  Moreover, section 550(a) of the Bankruptcy Code permits the Trustee to recover the actual property transferred from the Debtor itself.  *See In re Am. Way Serv. Corp.*, 229 B.R. 496, 531 (Bankr. S.D. Fla. 1999)(section 550(a) is purposefully flexible to allow a trustee to recover the property itself); *citing In re Blitstein*, 105 B.R. 133, 137 (Bankr. S.D. Fla. 1989).  To the extent dissipation of the Fraudulent Transfers is not enjoined, the Trustee will suffer irreparable injury to the extent he is unable to fully avail himself of the remedies proscribed by the Bankruptcy Code and recover the property fraudulently transferred by the Debtor to the Defendants.

### D. *The threatened injury to the Trustee outweighs whatever damage the proposed injunction may cause the Defendants.*

The balance of the hardships favors the Trustee because if the preliminary injunction is granted, the funds would be available to the Defendants in the event they prevail and would be available to the Debtor's bankruptcy estate in the event the Trustee prevails.  On the other hand, if the preliminary injunction is not granted, there is a strong likelihood that the funds would be disbursed, dissipated or depleted thus undermining the provisions of the Bankruptcy Code and frustrating this Court's ability to award appropriate relief to the Debtor's bankruptcy estate.

### E. *The injunction would not be adverse to the public interest.*

The issuance of a preliminary injunction will advance the strong public policy that the Trustee administer assets of the bankruptcy estate for the benefit of creditors and interested parties.  *Menotte v. Willis (In re Willis)*, 411 B.R. 783, 787 (Bankr. S.D. Fla. 2009) (citations omitted).

    **F.**     *There is no adequate remedy at law for the Trustee's equitable claims for imposition of a Constructive Trust and Equitable Lien.*

At Counts 3, 4, 7, 8, 11, 12, 15, 16, 19, 20, 24 and 25 of the Adversary Complaint, the Trustee asserted claims for imposition of a constructive trust and equitable lien against the Defendants.  Courts have held that injunctive relief is particularly appropriate where, as here, a plaintiff seeks equitable relief such as a constructive trust in order to protect the Court's ability to provide such relief and do equity.  See *United States ex rel. Rahman v. Oncology Assocs. P.C.*, 198 F.3d 489, 494-501 (4th Cir. 1999); *Quantum Corporate Funding, Ltd. v. Assist You Home Health Care Servs. Of Va., LLC*, 144 F. Supp. 2d 241, 250 n. 9 (S.D.N.Y. 2001); and *Trafalgar Power, Inc. v. Aetna Life Ins. Co.*, 131 F. Supp. 2d 341, 350 (N.D.N.Y. 2001).  Accord, *Republic of Philippines*, 806 F.2d at 355 (preliminary injunction based on a claim for imposition of a constructive trust and equitable lien was warranted).

**II.**     **This Court and other Courts have not hesitated to issue preliminary injunctions under similar circumstances.**

On April 23, 2010, this Court issued the Trustee a preliminary injunction in the adversary proceeding styled *Stettin v. Szafranski, et al.*, Case No. 10-02607-BKC-RBR-A [D.E. 75] ("the Szafranski Adversary Proceeding" and the "Szafranski Injunction, respectively").  In the Szafranski Adversary Proceeding, the Trustee asserted claims to avoid and to recover $32,796,263.98 in transfers from the Debtor to the Defendants as fraudulent and preferential transfers and for the entry of an order granting an equitable lien and constructive trust (as the Trustee does in the instant adversary proceeding).  Finding that it was appropriate to "maintain the *status quo*, preserve this Court's ability to award legal [and] equitable relief and provide for an enhanced distribution to the Debtor's creditors," this Court issued the Szafranski Injunction.

19

Recently, in *Janvey v. Alguire*, No. 10-10617, 2010 WL 5095506 (5th Cir. Dec. 15, 2010), the Fifth Circuit concluded that the district court properly issued a preliminary injunction in favor of a receiver who had asserted fraudulent transfer claims against recipients of transfers from a company that had operated a Ponzi scheme.  In so holding, the Court stated that the receiver demonstrated a substantial likelihood of success on the merits because evidence of intent to defraud creditors supported a finding of "substantial likelihood of success on the merits" under the Texas fraudulent transfer statute and transfers made from a Ponzi scheme were presumptively made with intent to defraud.  *Id*. at * 7-8.   (Citations omitted).   For similar reasons, the Court determined that the receiver demonstrated a substantial likelihood of success on the merits by submitting evidence of the company's transfers to the defendant-transferee (regardless of whether the defendant had any knowledge that the transferor was operating a Ponzi scheme).  *Id*. at 11.   The Court also concluded that the receiver carried his burden of proving irreparable harm because the receiver was entitled to a presumption that the defendant-transferees would dissipate the transfers absent a preliminary injunction because the transfers were fraudulently transferred as part of a Ponzi scheme.  *Id*.  Finally, the Court determined that the receiver carried his burden of proving that he would be irreparably harmed if the injunction did not issue because "the district court would not be able to grant the effective remedy, either in equity or in law, that the [r]eceiver seeks" "[i]f the defendants were to dissipate or transfer these assets out of the jurisdiction." *Id*. at 12.

Likewise, in *Rubin v. Pringle (In re Focus Media, Inc.)*, 387 F.3d 1077, 1085 (9th Cir. 2004), the Ninth Circuit concluded that temporary restraining orders and preliminary injunctions freezing assets may properly issue where an adversary proceeding alleges fraudulent conveyance or other equitable causes of action.  Since the trustee had asserted causes of action for fraudulent conveyance and constructive trust and the preliminary injunction was tailored to the relief

20

ultimately sought, the Court concluded that the bankruptcy court did not abuse its discretion in issuing the preliminary injunction.  *Id*.

Finally, in *Republic of Philippines v. Marcos*, 806 F.2d 344, 356 (2d Cir. 1986), *cert. denied*, 481 U.S. 1048 (1987), the Second Circuit stated that "preliminary injunctions are proper to prevent a defendant from making a judgment uncollectible . . . and [a] preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally."  (Citations omitted).

**III.** **The Trustee is not required to post a bond to obtain issuance of preliminary injunction against the Defendants.**

Bankruptcy Rule 7065 provides that Federal Rule 65 "applies in adversary proceedings, except that a . . . preliminary injunction may be issued on application of a . . . [trustee] . . . without compliance with [Federal] Rule 65(c)."  Federal Rule 65(c) in turn conditions the issuance of a preliminary injunction upon the posting of adequate security.  Accordingly, the Trustee is not required to post a bond to obtain issuance of a preliminary injunction against the Defendants.

**IV.** **Expedited Discovery Concerning the Defendants' transferees, assets, and liabilities is necessary, appropriate and in the best interests of the Debtor's bankruptcy estate.**

Federal Rules 30(a)(2)(A)(iii), 33(b)(2) and 34(b)(2)(A) (as incorporated into Bankruptcy Rules 7030, 7033, and 7034) allow a party to seek leave of court to conduct expedited discovery. For the foregoing reasons, the Trustee respectfully submits that expedited discovery of the nature, extent and whereabouts of the Defendants' transferees, assets, and liabilities is necessary, appropriate and in the best interests of the Debtor's bankruptcy estate in connection with the preliminary injunctive relief sought herein.

<u>CONCLUSION</u>

For the foregoing reasons, the Trustee respectfully requests that this Court issue a preliminary injunction following a hearing restraining and enjoining the Defendants, their third party counterparties or creditors, their attorneys, agents, employees, and all those who act in concert or participation with any of the foregoing from directly or indirectly disbursing, dissipating, disposing of, depleting, concealing, transferring, conveying, selling, assigning, pledging, hypothecating, and/or encumbering the transfers received from the Debtor or the proceeds, products or replacements thereof requiring actual notice to all of the Defendants' transferees of the pendency of the adversary proceeding and the preliminary injunction and for such other and further relief as the Court may deem just and proper.

Respectfully submitted this <u>20</u>th day of September, 2011.

**WE HEREBY CERTIFY** that we are admitted to the Bar of the U.S. District Court for the Southern District of Florida and that we are in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

GENOVESE JOBLOVE & BATTISTA, P.A.
Special Counsel to the Chapter 11 Trustee
100 S.E. 2nd Street, Suite 4400
Miami, FL  33131
Tel.: (305) 349-2300
Fax.: (305) 349-2310

By:/s/  John H. Genovese
       John H. Genovese, Esq.
       Florida Bar No. 280852
       David C. Cimo, Esq.
       Florida Bar No. 775400
       Robert F. Elgidely, Esq.
       Florida Bar No. 111856
       Jesus M. Suarez, Esq.
       Fla. Bar No. 60086

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on this <u>20th</u> of September, 2011 a copy of the foregoing was served by CM/ECF to the below-named party.

By:  <u>/s/ John H. Genovese</u>
     John H. Genovese, Esq.

### <u>SERVICE LIST</u>

| | |
|---|---|
| Regent Capital Partners, LLC<br>c/o Laura Huberfeld, Member<br>5521 11th Avenue<br>Brooklyn, New York 11219 | Laura Huberfeld<br>15 Manor Lane,<br>Lawrence, New York 11559 |
| Murray Huberfeld<br>15 Manor Lane<br>Lawrence, New York 11559 | Naomi Bodner<br>49 Dykstras Way E<br>Mosney, New York 19052-4023 |
| David Bodner<br>49 Dykstras Way E<br>Mosney, New York 19052-4023 | Bodner Family Foundation<br>c/o Ira Stechel, Esq., Registered Agent<br>Olshan Grundman, et al<br>505 Park Avenue<br>New York, New York 10022 |
| Dahlia Kalter<br>245 Trenor Dr<br>New Rochelle, NY 10804-3811 | Mark Nordlicht<br>245 Trenor Dr<br>New Rochelle, NY 10804-3811 |
| SFS Capital Funding, LLC<br>c/o Ramon A. Rasco, Esq.<br>Podhurst Orseck, P.A.<br>City National Bank Building<br>25 West Flagler Street, Suite 800<br>Miami, FL 33130 | SFS Capital Funding, LLC<br>c/o John C. "Jack" Shawde, Esq.<br>jshawde@rascoklock.com<br>283 Catalonia Avenue, 2d Floor<br>Coral Gables, FL 33134 |



**ORDERED in the Southern District of Florida on October 06, 2011.**

**Raymond B. Ray, Judge**
**United States Bankruptcy Court**

_____

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

| | |
|---|---|
| In re: | Chapter 11 |
| ROTHSTEIN ROSENFELDT ADLER, P.A., | Case No. 09-34791-BKC-RBR |
| Debtor. | |
| _____/ | |
| HERBERT STETTIN, Trustee, | |
| Plaintiff, | Adv. Case No. 11-02473-RBR |
| v. | |
| REGENT CAPITAL PARTNERS, LLC, *et al.*, | |
| Defendants. | |
| _____/ | |

**AGREED ORDER GRANTING *AGREED EX PARTE MOTION TO CONTINUE
PRETRIAL CONFERENCE AND ALL RELATED DEADLINES* [ECF NO. 12]**

THIS CAUSE came before the Court upon the *Agreed Ex Parte Motion to Continue

Pretrial Conference and All Related Deadlines* [ECF No. 12] (the "Agreed Motion"), filed by

defendants Regent Capital Partners, LLC, Laura Huberfeld, Murray Huberfeld, Naomi Bodner,

Case No. 11-02473-RBR

David Bodner, Bodner Family Foundations, Dahlia Kalter, and Mark Nordlicht (collectively, the "Defendants"), seeking the entry of an order continuing the pretrial conference and all related deadlines in this matter by ninety (90) days.  Upon consideration of the Agreed Motion, the agreement of the Plaintiff and Defendants, good cause appearing, and the Court being otherwise fully advised, it is

        **ORDERED** as follows:

        1.      The Agreed Motion is GRANTED.

        2.      The Pretrial Conference in the above-captioned adversary proceeding is continued to **January 10, 2012 at 9:30 AM** (the "Continued Pretrial Conference Date") and will take place at the U.S. Bankruptcy Court, 299 E. Broward Blvd., Room 308, Fort Lauderdale, FL 33301.

        3.      All deadlines in the *Order Setting Filing and Disclosure Requirements for Pretrial and Trial* [ECF No. 3] are extended accordingly and shall be determined by the Continued Pretrial Conference Date.

                                        #       #       #

Submitted by:
Harris J. Koroglu, Esq.
Shutts & Bowen LLP
1500 Miami Center
201 South Biscayne Blvd.
Miami, Florida 33131
Telephone: (305) 358-6300
Email:  hkoroglu@shutts.com

Attorney Koroglu shall serve a conformed copy of this Order upon receipt of same on all parties in interest and shall file a Certificate of Service with the Court.
MIADOCS 5718292 3

-2-